**STATE of Missouri, Respondent,**

v.

**Robert James THORNTON, Appellant.**

**No. KCD 27179.**

Missouri Court of Appeals, Kansas City District.

Dec. 31, 1975.

Gary Eldredge, Kansas City, Lee M. Nation, Law Student, Certified, for appellant.

John C. Danforth, Atty. Gen., Philip M. Koppe, Asst. Atty. Gen., Jefferson City, for respondent.

Before SWOFFORD, P. J., and WELBORN and HIGGINS, Special Judges.

SWOFFORD, Presiding Judge.

This is a direct appeal from a conviction of manslaughter and a sentence of ten years imprisonment following a jury trial in the Circuit Court of Boone County, Missouri.

On January 8, 1970, at approximately 6:30 p. m., one James Bierley was found by ambulance attendants called to the scene alone in his quarters at 400 Hitt Street in Columbia, Missouri, on a bed, bleeding from multiple chest wounds. He was pronounced dead at 7:30 p. m. by the Boone County Coroner, who, by autopsy, determined that within an hour before his death he had sustained six stab wounds in the chest and stomach, one of which penetrated the lung and the heart and was the direct cause of death.

The structure at 400 Hitt Street is a three-story residence converted into multiple rental units of rooms or apartments. Bierley occupied No. 301, and the defendant was also a resident at that address, occupying a room on the second floor.

On the night of January 8, 1970, the police conducted an investigation of the premises, during the course of which a knife was found in a wastebasket in a communal bathroom, covered with papers. This knife was described as a black bone handle Barlow saber knife. On the night of the homicide, the police questioned various residents of the address, including the defendant, who disclaimed any observations or knowledge of Bierley's homicide. When questioned the following day, January 9, 1970, the defendant told police conflicting stories as to his whereabouts at the time of the attack on Bierley.

During the course of the investigation, it was learned that the defendant owned a knife similar to the one found in the wastebasket, and on January 12, 1970, he consented to an interview by Columbia detectives at police headquarters. At that time, he was handed a written waiver of rights, read it aloud and signed it, stating he fully understood its contents. He thereupon admitted the ownership of a knife similar to a Barlow shown him, among others, except that the blade of his knife had been ground and the sample had not. The knife found in the wastebasket was not displayed to him because it was undergoing tests at Jefferson City. Under interrogation, he made an oral confession that he had killed Bierley, which was thereupon reduced to writing and signed by him and witnessed by the two interrogating officers. This statement was admitted into evidence, read aloud by an officer, and passed to the jury. It constituted the state's principal evidence against the defendant. It is as follows:

"Statement of Robert James Thornton, age 31, taken January the 12th, 1970, at the Columbia Missouri police department. My name is Robert James Thornton, age 31. I presently reside at room 206, 400 Hitt Street. I am employed by the University and work as a janitor at the Engineering Building. I am giving this statement to Detective Vemer whom I know to be a member of the Columbia Police Department. Before giving this statement I first read and was advised of my rights by Detective Christian. I have signed the waiver of rights. The statement is with reference to the murder of James Bierley on the evening of January 8, 1970. I didn't go to work on this date as I had been drinking. I have previously been in the Fulton State Hospital because of a drinking problem. I started drinking on this date, January 8, 1970, about 5:00 p. m. I drank about one-half of a fifth of vodka. I also smoked two joints of marijuana that I got from a friend of mine. I do not know his name but only know him on sight. I met him on the corner of University and Hitt Street around 5:15 p. m. I paid him 75¢ a piece for the joints. I had been drinking when I bought the joints, then after buying the joints I went back to my room and smoked them. Then after I smoked them I went walking around. After I came back from walking, James Bierley came to my room and sat down and we talked and listened to the radio. I don't remember exactly what time this was, by this time I was getting pretty high. I would estimate the time to be about six o'clock. Bierley sat in my room and talked. He talked about his bicycle and radio, first one thing then another. Then he said, 'Let's go up to my room and watch television.' And I agreed to do this and we went. His room number is 301. After getting up there we sat and watched television. We left the door open when we went in. The television was sitting over by the north wall on a stand, I believe it was on a stand. I know it was

by the north wall. I sat on the bed which was against the south wall of his apartment. Bierley sat down beside me on the bed. He was sitting on the west side of me, this would have been between me and the west wall of the room. He did not drink anything that I know of. I took my bottle of vodka with me to his room and I drank vodka out of the bottle and watched television. I also saw a radio in his room while I was there. It was sitting on a table in the room. We sat there for about thirty minutes, I guess, until around six or six thirty p. m. *Then he started playing with me and put his arm around me. When he played with me he started kissing me on the jaw and playing with my meat through my trousers. I told him three or four times to quit what he was doing and he just kept on like he didn't hear me. He didn't say anything to me when he was doing this, he was just breathing hard and acting freakish. Then I got up to leave the room and he came and grabbed me. He grabbed me as I was starting out of the door of the room and pulled me back into the room.* I was facing to the east at the time he grabbed me with my back to him. He grabbed me by putting both of his hands and arms around my waist, then he pulled me back into the room. When he pulled me back into the room I kind of went blank. *I remember breaking loose from him and starting to stab him.* I remember the first time I stabbed him I was standing up and so was he. I do not know for sure where I stabbed him the first time. I do remember stabbing him several times, I cannot say just how many times, maybe three or four times. I don't remember if I stabbed him after he fell on the bed or not. I don't remember if he said anything to me when I was stabbing him or not. *Queers and freaks upset me a lot and I try to stay away from them as much as possible.* I guess when he stabbed (sic) me I just lost my temper and went out of my mind completely insane. The next thing I remember after

stabbing him was leaving his room and going downstairs in the hallway and I just stood there. Then I went to my room and sat down in a chair and sat there for I don't know how long. *Before going downstairs I went to the bathroom or toilet on the same floor as Bierley's room and put the knife in a wastebasket in the room. I put the knife in the bottom of the wastebasket and covered it with some papers. The papers were already there and I just took them out and put the knife in the bottom and covered it with them.* I don't remember if I washed the knife or not, I was very upset and high on narcotics and drunk from liquor so I just don't know what I did exactly. The knife I had used had a black bone handle, maybe plastic, it had about a two and one-half inch blade on it. I had previously ground the blade on it, but this was about two or three months before the murder happened. I haven't heard from the guy I stabbed until this date. I haven't seen him since the night I stabbed him. I do definitely remember stabbing this man, James Bierley. *I don't remember him hitting me or threatening me in any way.* I know that he was trying to queer me and I just blew up and started stabbing him. *He had not made any threats to me.* I do not remember what clothes I was wearing when the stabbing occurred. I do not remember what program we were watching on the television at the time I went into his room. I did not take any items from his room. I did not take any of his money or anything. I have read the above one and one-half page of this statement and find it true and correct to the best of my knowledge. I give this statement of my own free will. No threats or promises were made to me to make me give this statement. Witnesses, Robert S. Vemer, Don E. Christian. Signed by Robert J. Thornton." (Emphasis supplied)

It should be here noted that defendant does not assert, upon this appeal, any violation of constitutional safeguards regarding the procurement of this statement. On the contrary, the thrust of his first point is that, since the state offered this statement as part of its case, it is bound by the facts therein stated and that under those facts the state failed, as a matter of law, to establish or prove the non-existence of justifiable homicide or self-defense beyond a reasonable doubt. As this point is understood, the defendant's contention, otherwise stated, is that the uncontroverted facts contained in this statement establish the defense of justifiable homicide, as a matter of law, and therefore the trial court erred in overruling his motions for acquittal. On the other hand, the state argues that even though each of the defendant's statements of fact in his confession is not controverted by other direct evidence, his claim of self-defense, under the facts stated in the confession and other circumstances, remained a question of fact for the jury.

Preliminary to a resolution of this point, a procedural question raised by the state must be resolved. The defendant was initially charged with First Degree Murder. During the trial, the state amended its information reducing this charge to Second Degree Murder. The case was submitted to the jury on the amended charge and on the lesser included offense of Manslaughter, upon which the jury found the defendant guilty.

■ In his motion for a new trial, the defendant asserted that the court erred in denying his motions for acquittal because the state had failed to prove all of the elements of "murder in the second degree". The state now asserts that since the defendant was convicted of manslaughter, the sufficiency of the state's case to support that charge is not preserved or properly before the court under the foregoing allegation in the motion for a new trial. It is obvious that the allegation in the motion referring to Second Degree Murder rather than Manslaughter was an inadvertent typographical error and neither the state nor the court

below was misled by the error and the matter was treated below, by all parties, on the basis of the sufficiency of the evidence to support the conviction of manslaughter. The defendant's first point, therefore, will be fully considered.

■■ Preliminary attention must be focused upon another matter for clarity of the sole issue here presented under Point I. The defendant concedes in his brief that the state's evidence established a submissible case on the basic elements constituting second degree murder (p. 11) and confines his attack on the conviction under his first point solely to the contention, as above noted, that the state failed to meet its burden with reference to justifiable homicide or self-defense. In deciding this point, there are large areas of relevant and established legal principles which, as a premise, must be and are recognized by the parties and by this court.

Section 559.040 RSMo 1969, provides in pertinent part:

"Homicide shall be deemed justifiable when committed by any person in either of the following cases:

(1) In resisting any attempt to murder such person, or to commit any felony upon him or her, * * * "

This statute is applicable to the case at bar because sodomy is a felony in Missouri (§ 563.230 RSMo 1969) and under the confession of defendant, the deceased was engaged in an attempt to commit sodomy upon him at or near the time of the homicide. *State v. Robinson*, 328 S.W.2d 667, 670[2] (Mo.1959); *State v. McQueen*, 431 S.W.2d 445, 448[1, 2] (Mo.1968). Therefore, if there was a prima facie showing of self-defense or justifiable homicide (whether gleaned from the evidence of the defendant or of the state) the burden of proof, beyond a reasonable doubt, rested with the state to show that the killing was not justifiable. *State v. Minnis*, 486 S.W.2d 280, 284[3] (Mo. 1972); *State v. Ford*, 491 S.W.2d 540, 542[3] (Mo.1973); *State v. Tindall*, 496 S.W.2d 267, 270[5] (Mo.App.1973).

■ But the broad sweep of these principles is restricted and confined by equally well-established and defined safeguards in determining whether or not a person whose acts are within their apparent purview, in fact, comes within their protection. As applicable to this case, which involved a homicide allegedly committed in self-defense, three of these are of significant importance:

(1) The defendant believed that he was faced with real or apparent danger of bodily harm or the infliction upon him of the felony of sodomy and that his acts were necessary to prevent this. *State v. Turner*, 246 Mo. 598, 152 S.W. 313, 315[3] (1912); *State v. Jackson*, 511 S.W.2d 771, 776[10] (Mo.1974); *State v. Brown*, 502 S.W.2d 295, 299[3, 4] (Mo.1973).

■ (2) The defendant had reasonable grounds for such belief. *State v. McQueen*, 431 S.W.2d 445, 449[4] (Mo.1968). Whether or not defendant "had such reasonable grounds is generally a question for the jury." *State v. Singleton*, 77 S.W.2d 80, 83[3, 4] (Mo.1934).

(3) The defendant did not use more force (inflicting mortal wounds) than reasonably appeared to him to be necessary to resist the advances or assaults by Bierley under the circumstances. *State v. Rash*, 359 Mo. 215, 221 S.W.2d 124, 126[3] (1949); *State v. Singleton*, supra; *State v. Parker*, 403 S.W.2d 623, 627[3, 4] (Mo.1966). Further, that the defendant, before resorting to homicide in self-defense, had previously done everything in his power consistent with his own safety to otherwise avoid the danger. *State v. Sherrill*, 496 S.W.2d 321, 325–326[14] (Mo.App.1973); *State v. Young*, 510 S.W.2d 732, 734[1] (Mo.App.1974).

■ The determination of defendant's first point also requires the application of the well-established rule, as stated in *State v. Rash*, supra, 221 S.W.2d at l.c. 124[1]:

" * * * Ordinarily self defense is in the nature of an affirmative defense, and a question for the jury. *But whether the*

*state's evidence, which is neither disputed nor contradicted, established self defense so as to make a killing justifiable homicide instead of murder or manslaughter is a question of law for the court."* (Emphasis added)[1]

A further refinement of this rule is found in *State v. Jackson,* 522 S.W.2d 317 (Mo. App.1975) and cases cited therein, where the court said, at l.c. 319[1, 2]:

" * * * But where the evidence is conflicting *or of such a character that different inferences might reasonably be drawn therefrom,* it is generally a question of fact for the jury to determine whether the accused acted in self-defense in a particular case. (cases cited) * * Only when all the evidence is undisputed *and clear* should a court dispose of a murder or manslaughter charge by acquittal without tendering the issue of self-defense to the jury (cases cited). Rarely, then, is self-defense declared by law so as to bar the submission of the homicide offense altogether." (Emphasis added)

■ From a close and detailed review of this record, it is apparent that the elements of justifiable homicide or self-defense are not so "clear" as "to bar the submission of the homicide offense". Inferences can reasonably be drawn from the evidence consistent with manslaughter and at war with the defense of jusitifiable homicide.

Although the defendant had been drinking and smoking marijuana prior to the homicide, and, according to psychiatric evi· dence offered in his defense was in a state of "homosexual panic" at the time he stabbed Bierley, they had been sitting in a small room with the door open; there were no physical signs of a struggle in the room nor any sort of weapon found therein or on Bierley's person; and the other residents of the house, questioned by the police, heard no unusual noises or outcries.

Defendant's statement relates that some improper sexual advances and contacts were inflicted upon him by Bierley, but he then made no attempt to leave the room but instead told Bierley three or four times "to quit", although "queers and freaks" upset him a lot and he "tried to stay away from them as much as possible". He stated that Bierley did not threaten him and he has no remembrance of any threats or that Bierley hit him.

When he did start to leave, presumably through the open door, Bierley grabbed him around the waist with both arms and hands "and pulled me back into the room". At that time, the defendant's back was to Bierley but he "broke loose from him and started to stab him". The stab wounds were inflicted on the front of the victim, so the reasonable inference is that the defendant, after breaking loose, procured his knife opened it, faced Bierley, and stabbed him six times. At this time, the defendant could not have been more than a step, or at most two steps, from the open door and the safety of the common hallway.

■ The defendant did not call for help nor make any report of the matter to the police or anyone else, but instead, carefully hid his knife and proceeded to his room on the second floor. The concealment of the weapon was an attempt to conceal the crime and could be accepted, along with his other conduct following the stabbing, as a consciousness of guilt. *State v. Henderson,* 510 S.W.2d 813, 822[16] (Mo.App.1974); *State v. Ruckman,* 222 S.W.2d 74, 75[4] (Mo.1949). Further, when questioned by the police later on the evening of the crime, he denied all knowledge of the attack on Bierley and thereafter gave conflicting accounts as to his whereabouts at the time of the homicide. All of the foregoing acts

---

1. In concluding that the state's evidence in *Rash* established that the homicide was justified in self-defense, the court said, 221 S.W.2d l.c. 126[6]: " * * * Thus it failed to prove the crime charged, * * * *",* clearly ruling that the requisite intent and purpose was not shown to prove the punishable crime of manslaughter.

of the defendant immediately following and for four days after the homicide are circumstances indicative of a consciousness of guilt and attempts to remove suspicion from himself, and are consistent with guilt and not justifiable homicide. *State v. Stapleton*, 518 S.W.2d 292, 297–298[2] (Mo. banc 1975).

The evidence certainly raised inconsistent inferences which could reasonably be drawn therefrom, and the trial court properly submitted the case to the jury under proper instructions on both the offense and the defense of justifiable homicide or self-defense. The first point is ruled against the defendant.

■ The second point raised by the defendant, upon which he seeks reversal of this conviction, apparently falls within two distinct categories. *First*, he asserts that his confinement for three and a half years in a mental hospital, despite "repeated findings of competency" requires the dismissal of the charge. It may be gleaned from his argument that what he is really claiming is that he was thereby denied his constitutional right to a speedy trial. *Second*, the trial court lost jurisdiction to try him because no finding was made "of record" that appellant was competent to stand trial. Facts supportive of this position, if they exist, do not appear in the transcript on appeal nor in any exhibits presented to this court as a part thereof.

Be that as it may, this point was not asserted by the defendant in his motion for a new trial nor presented to or expressly decided by the trial court as required by Rule 84.13 (made applicable to appellate proceedings in criminal cases by Rule 28.18). Thus, the point is not preserved for review on this appeal. *State v. Wright*, 515 S.W.2d 421, 432[6] (Mo. banc 1974); *State v. Carr*, 499 S.W.2d 788, 790[4] (Mo.1973); *State v. Rinck*, 467 S.W.2d 897, 899[5] (Mo.1971). Nor does this record disclose any facts that would impel this court to review the point under Rule 84.13(c).

■ The defendant's third (and last) point on this appeal is that the trial court

should have sustained his motion for acquittal at the close of all the evidence because it was established, "as a matter of law", by the weight of the credible evidence, that at the time of the alleged offense, he was suffering from a mental disease or defect excluding responsibility. Here also, the state claims that the point is not preserved for review. However, by a most liberal interpretation of the defendant's motion for a new trial, this point has been carefully reviewed and must be ruled against the defendant.

Prior to the commencement of the trial, the defendant filed his motion (notice) for permission to rely upon the defense of mental disease or defect excluding responsibility for the Bierley homicide, in accordance with the provisions of Section 552.030(2) RSMo 1969. This motion was sustained and at the trial the defendant offered the testimony of two psychiatrists who gave opinions that at the time of the homicide, the defendant was suffering from a schizophrenic disorder or reaction, acute psychotic process or character neurosis characterized as "homosexual panic". This emerges from a close study of the doctors' testimony as a violent emotional reaction to a homosexual situation stemming from a person's conscious, or subconscious, awareness of his own homosexual tendencies and a desire to conceal them at any cost. The result, as one witness expressed it, is conduct resulting in "fright, flight or fight", and a loss of ability to distinguish between right and wrong and the suspension of premeditation or wilful intent. Thus, the defendant put into issue his legal responsibility for Bierley's death.

The state offered rebuttal testimony of two psychiatrists who expressed contrary opinions. The court instructed the jury as to the definition of "mental disease or defect" and on the presumption of freedom from such and the burden of proof on that issue. No question was raised in the court below, nor on this appeal, as to the propriety of these instructions, and the jury, by its verdict of guilty, rejected this defense.

This issue, thus developed, was properly for the jury. Section 552.030(7) RSMo 1969, provides in part:

"All persons are presumed to be free of mental disease or defect excluding responsibility for their conduct * * * The issue of whether any person had a mental disease or defect excluding responsibility for his conduct is one for the jury to decide upon the introduction of substantial evidence of lack of such responsibility. * * * "

It has been held that this statutory presumption alone is sufficient to take the issue to the jury. *State v. Holmes*, 439 S.W.2d 518, 522[5] (Mo.1969); *State v. King*, 526 S.W.2d 58, 59[4] (Mo.App.1975). Here, the state did not rely solely upon the presumption but offered rebuttal medical evidence. Clearly, the trial court did not err in refusing to direct an acquittal of defendant on this issue. Defendant's third point is ruled against him.

Judgment affirmed.

All concur.