STATE of Missouri, Respondent,

v.

George Hilliard DAVIS, Appellant.

No. KCD 29786.

Missouri Court of Appeals,
Kansas City District.

Oct. 2, 1978.

Robert B. Paden, Maysville, for appellant.

John D. Ashcroft, Atty. Gen., Paul Robert Otto, Asst. Atty. Gen., Jefferson City, for respondent.

Before SOMERVILLE, P. J., and DIXON and TURNAGE, JJ.

SOMERVILLE, Presiding Judge.

Defendant was charged with second degree murder (Sec. 559.020, RSMo 1969), found guilty of manslaughter (Sec. 559.070, RSMo 1969) by a jury, and sentenced to ten years confinement in the Missouri Department of Corrections.

The points of error relied on by defendant, four in number, are as follows: (1) the trial court erred in overruling defendant's motion for verdict of acquittal at the close of the state's case because under the evidence introduced by the state defendant, as a matter of law, acted in self-defense; (2) the trial court erred in admitting State's Exhibit No. 9 (a knife) in evidence over defendant's objection that there was a "break in the chain of custody" with respect to said exhibit; (3) the trial court erred in permitting the "late" endorsement of a witness by the state on the information; and (4) the trial court erred "in failing to direct a verdict of acquittal in favor of the defendant during the [closing] argument of the prosecuting attorney" because of the latter's comment "on the failure of the defendant to report to law enforcement officers from the date of the homicide until February 3, 1977."

Defendant's points relied on, particularly his first and second points, necessitate a somewhat comprehensive review of the evidence introduced by the state. In doing so it should be noted that in certain critical areas much of the state's proof consisted of two extrajudicial statements made by defendant, one to agents of the F.B.I. on February 3, 1977, in Pasadena, Texas, and the other to the Sheriff of DeKalb County, Missouri, on February 14, 1977, in DeKalb County. The admission of these extrajudicial statements has not been challenged by defendant on appeal.

The defendant and Grover Slawson Silvers (hereinafter the victim), according to the extrajudicial statements heretofore referred to, first met in the convivial atmosphere of a bar in St. Joseph, Missouri. The defendant was from Pasadena, Texas, and the victim was from Union Star, DeKalb County, Missouri. The two struck up a "friendship of sorts" and defendant accompanied the victim home. On July 22, 1976, the victim and the defendant (a guest in the victim's home) "got up real early and started drinking". They favored "peppermint schnapps and beer". During the afternoon two teenage boys came by the victim's home. After they left defendant took a nap and was awakened "about dusk" by the victim. Thereupon the victim talked to defendant "excessively about [one of the teenage boys] . . . being a homosexual". Defendant advised the victim that he "didn't participate in any homosexual activities and didn't like that sort of talk". However, the victim kept "aggravating" defendant with such talk. In order to avoid being subjected to further "talk" of that kind, defendant went into the kitchen of the victim's home. The rear door of the victim's home was approximately five feet from a counter which contained a kitchen sink. An open door led from the kitchen to an adjoining bedroom. At this point the two extrajudicial statements, in certain important respects, vary considerably. According to the statement given to the F.B.I. agents, the following then occurred: "When I got into the kitchen he grabbed at me at which time I hit him in the head with a Coke bottle which I had in my hand at that time. I then picked up a butcher knife that I saw laying on the counter. At that time Silvers said, 'I'm going to get you,' and turned running toward his bedroom. I then

went after Silvers, when I saw him in his room he was standing next to his bed. When he turned around I stabbed him in the chest with a butcher knife that I had in my hand. I then became extremely frightened and ripped the telephone out of the wall, went to the kitchen where I washed my hands and the knife and thereafter put the knife back where I got it. The keys to Silvers' 1966 Chevrolet stationwagon were on the table so I picked them up and left in his vehicle. After leaving Silvers' house, I drove all night and just before getting to the Arkansas border, picked up a hitchhiker who wanted to go to the house of a friend of his, Wayne Rogers, who lived in Springdale, Arkansas. . . ." According to the statement given to the Sheriff of DeKalb County, the following then occurred: "He took hold of my arm and shoved me. I kept telling him to leave me alone but he wouldn't do it. I picked up a Coke bottle from the kitchen table and hit him on the forehead—but it didn't phase him. He grabbed me and started pulling me toward the bedroom and said, 'I'll get you' or 'I'll fix you', I don't know which. I reached over and got a knife off the sink there. Then we were in the bedroom. I said, 'Let me go, let met go', but he wouldn't. I popped him one—he fell on the bed backwards. I pulled the knife out and went to the kitchen and washed the knife and my hands. I went back to the bedroom and I believe I put his feet up on the bed. I reached over and jerked the telephone wires loose. I went in the kitchen and saw the car keys and picked them up. Then I got my other stuff together and took off. I went out the front door and got in his car and left. I drove all night before I got to Kansas City. I drove in Missouri all day Friday and I picked up a hitchhiker before I got to Arkansas. . . ."

The state's evidence, apart from defendant's extrajudicial statements, also disclosed the following. The victim's body was not discovered until Sunday, July 25, 1976. When discovered it was lying upon a bed in the bedroom adjacent to the kitchen. No foul play was suspected at the time and the victim's death was presumably believed to have resulted from natural causes. However, when the victim's body was being prepared for interment embalming fluid "spurted out" of an aperture caused by an incision in the victim's chest. Nevertheless, funeral services proceeded and the victim's body was buried.

Several neighbors and relatives who entered the victim's home at or near the time his body was found testified that nothing in the house was in a state of "disarray". One of the neighbors further testified that he did not "notice a knife or any other type of instrument in the bedroom" were the victim's body was found.

On July 28, 1976, the Sheriff of DeKalb County, in response to a call from the City Marshal of Union Star, conducted a limited investigation at the victim's home. During the course of his investigation, the sheriff found a knife in the victim's house "in a dish drainer" on a counter adjacent to the kitchen sink. The knife was left in place at the victim's home until September 2, 1976, when the sheriff returned and picked it up from the place where he had first seen it on July 28, 1976, i. e., "in a dish drainer" on a counter adjacent to the kitchen sink. The knife which the sheriff removed from the "dish drainer" was marked State's Exhibit No. 9 during the trial, identified and admitted into evidence over defendant's objection that there was a "break in the chain of custody". A neighbor of the victim testified that the victim's home was locked from July 25, 1976, until September 2, 1976, except for a period of time on July 28, 1976, when it was unlocked to admit the Sheriff of DeKalb County. This witness further testified that the windows of the victim's house were "up" during the entire period of time just mentioned.

Disinterment of the victim's body was judicially ordered approximately thirty days after it was buried, and an autopsy was then performed. The pathologist who performed the autopsy testified that the victim "died from a stab wound of the chest which resulted in internal bleeding". The pathologist described the would inflicted upon the victim as follows: "[T]he knife entered in

the third right rib, actually sliced a little bit of the top of the rib off, split it longitudinally, and cut the upper lobe of the right lung. It cut the sack enclosing the heart and cut the aorta, the large vessel at the top of the heart where it leaves the heart, and then went on through, through the back layer of the sack enclosing the heart, then ended in one of the verta bra, that is a bone of the spine." The pathologist equated the force required to inflict such a wound as being "about as much force as it takes to crack some spare ribs with a cle[a]ver."

In pursuing his first point defendant argues that the extrajudicial statement which he gave the F.B.I agents was preempted by the later and more favorable one he gave to the Sheriff of DeKalb County, and therefore only the latter should be considered in resolving his first point. The state acquiesced as evinced by the following statement found on page 19 of its brief: "Because state's Exhibit 2 [the statement defendant gave to the F.B.I agents] does not raise any claim of self-defense only state's Exhibit 3 [the statement defendant gave to the Sheriff of DeKalb County] need be considered in deciding whether the state's admission of the confession established as a matter of law that the appellant acted in self-defense."

*State v. Thornton,* 532 S.W.2d 37 (Mo. App.1975), is principally relied upon by both the defendant and the state as illuminating the way for disposing of point one. There, as here, the accused contended that the state's evidence, as a matter of law, established that he acted in self-defense. In *State v. Thornton,* supra, at p. 42, the court emphasized four constituent requirements of self-defense. Substantially paraphrased, they are: (1) he who relies upon self-defense must believe that he is faced with the danger of having death, great bodily harm or a felony inflicted upon him; (2) he must have reasonable grounds for such belief; (3) he must not use more force than reasonably appears necessary to him under the circumstances to resist the danger with which he reasonably believes he is confronted; and (4) before resorting to the extreme measure

of homicide, he must do everything in his power consistent with his own safety to otherwise avoid the danger. Fully aware of the difficult challenge presented when called upon to resolve whether self-defense is established as a matter of law or is a question of fact for the jury, the court in *State v. Thornton,* supra, at pp. 42–43, leaned heavily upon *State v. Rash,* 359 Mo. 215, 221 S.W.2d 124, 124 (1949), and *State v. Jackson,* 522 S.W.2d 317, 319 (Mo.App.1975). *Rash* was cited for the proposition that although self-defense is ordinarily a question of fact for the jury, whether undisputed and uncontradicted evidence introduced by the state establishes self-defense presents a question of law for the court. *Jackson* was cited for its recognition of cases dealing with certain aspects of the foregoing propositions in greater depth, namely, cases holding that self-defense is generally a question of fact for the jury when the evidence appertaining thereto is conflicting or of such a character that different inferences might reasonably be drawn therefrom, and cases holding that self-defense is seldom established as a matter of law and that acquittal of an accused by reason of self-defense as a matter of law, so as to bar submission of the charged homicide offense to the jury, is relegated to those exceptionally rare instances where all the undisputed and uncontradicted evidence clearly establishes self-defense.

After carefully evaluating the evidence in this case in light of the various principles garnered from *State v. Thornton,* supra, this court is constrained to hold that the state's evidence did not establish, as a matter of law, that defendant acted in self-defense and the trial court properly responded to the evidence by submitting the issue of self-defense to the jury by way of appropriate instructions. A number of cogent reasons exist for drawing this conclusion: (1) evidence that defendant had time to secure and strike the victim with a Coke bottle and thereafter secure a knife from the kitchen sink counter permits the reasonable inference that defendant was presented with ample opportunity to retreat from

the victim's home before resorting to the extreme measure of taking the victim's life; (2) a lack of disarray in the victim's home and defendant's disconnection of the telephone are inconsistent with his claim of self-defense; (3) the absence of a "knife or any other type of instrument" in the bedroom where the victim's body was found belies any claim by defendant that he reasonably believed that he was faced with a real or apparent danger of death, great bodily harm or a felony being inflicted upon him by the victim; and (4) the danger which defendant claims to have relied upon, somewhat illusionary at best, when coupled with the force with which defendant drove the knife into the victim's chest, strongly suggests that defendant resorted to more force than could be said to have reasonably appeared necessary under the circumstances. Although this court's research has failed to disclose that flight has heretofore been specifically discussed in this state in the limited context of self-defense, it has been held in other jurisdictions that flight is inconsistent with self-defense. See *Thomas v. State,* 214 Ark. 736, 217 S.W.2d 839, 840 (1949); *Yarbrough v. State,* 13 Okl.Cr. 140, 162 P. 678, 679 (1917); *Washington v. State,* 113 Tex.Cr.R. 291, 21 S.W.2d 524, 525 (1929). All of the above substantially negates any basis for holding that the state's evidence established that defendant acted in self-defense as a matter of law, and by the same token affirms the action of the trial court in submitting the question of self-defense to the jury by appropriate instructions.

Defendant's second point questions the admissibility of State's Exhibit No. 9 (knife) on the sole ground that there was a "break in the chain of custody" from July 28, 1976, the date the knife was first observed by the sheriff, until September 2, 1976, the date the knife was seized by the sheriff. Literally speaking, defendant's second point—"the trial court erred in admitting into evidence State's Exhibit No. 9 over the objection of the defendant when there was a distinct and complete break in the chain of custody of State's Exhibit No. 9"—does not question the knife as being the

murder weapon. Bearing this in mind, the looming fallacy of defendant's second point is quickly discernible. When, as here, an exhibit is susceptible of positive identification and is sufficiently identified to warrant its admission into evidence, the importance that might otherwise attach to its chain of custody fades into obscurity. *State v. Granberry,* 484 S.W.2d 295, 300–01 (Mo. banc 1972), and *State v. Holman,* 556 S.W.2d 499, 504 (Mo.App.1977). Defendant's unmitigated extrajudicial admission that he obtained the knife with which he stabbed and killed the victim from the kitchen counter and after fatally using it washed and put it back where he originally got it goes far to eliminate any aura of prejudice that might otherwise surround the admission of State's Exhibit No. 9 in evidence. Everything considered, defendant's second point fails to demonstrate any reversible error.

In his third point defendant faults the trial court for permitting the late endorsement of a witness' name on the information by the state. Defendant attempts to forge reversible error from the following facts. The state, in response to defendant's request for discovery pursuant to Rule 25.-32(A)(1), omitted naming Charles Nichols as one of the persons whom it intended to call as a witness. According to the prosecuting attorney, the state's reason for not doing so was that Nichols' identity was then unknown. This also accounted for Nichols' name not being originally endorsed on the information as a witness. The prosecuting attorney further advised the trial court that Nichols' identity as one of the two boys who stopped by and visited with the victim and the defendant at the victim's home on the afternoon of July 22, 1976, went undiscovered until a "week or week and a half" before August 11, 1977, the date the case was set for trial. On August 4, 1977, the prosecuting attorney gave defense counsel notice that he would seek to have Nichols' name endorsed as an additional witness on the information and on August 8, 1977, the prosecuting attorney gave defense counsel a summary of Nichols' anticipated testimony.

Parenthetically, although no specific finding as such was made by the trial court, it is implicit from the record that the trial court accepted as true the prosecuting attorney's explanation of why Nichols' name was not originally endorsed on the information as a witness.

On the morning of the trial, defendant objected to Nichols' name being endorsed as a witness on the information. The trial court withheld its ruling and ordered the state to make Nichols available to defense counsel for an "interview" before the trial commenced and further ordered defense counsel to report back to him if the interview developed any "additional matters or material" which would necessitate further investigation "to prepare for [Nichols'] testimony". After defense counsel interviewed Charles Nichols, the trial court specifically asked defense counsel if the interview revealed anything which would "dictate or necessitate any further investigation" of the witness or his proposed testimony. Defense counsel affirmatively stated to the court that the interview had not revealed anything which would require further investigation and tacitly conceded that what the witness told him was quite innocuous. Against this background the trial court permitted the state to endorse Charles Nichols' name on the information as an additional witness. Defendant reasons his objection to the late endorsement of Nichols' name on the information as a witness to be tantamount to a request for the trial court to have imposed the sanction of exclusion authorized in Rule 25.45 because of the state's failure to include Nichols' name and address when it responded to the defendant's request for discovery pursuant to Rule 25.32 some five and a half months earlier. This highly convoluted reasoning indulged by defense counsel cannot withstand close scrutiny. Rule 25.37, captioned "Continuing Duty to [make] Disclosure", recognizes that certain information sought by way of discovery, for example the existence and identity of all potential witnesses, may not be known when an original request for discovery is made. For this obvious reason the Supreme Court wisely provided that a party has a continuing duty to disclose subsequently obtained information if it be information which he would have been required to disclose if known at the time of the request or order for disclosure. The state complied with Rule 25.37, supra, and defendant's third point could properly be laid to rest on that ground alone.

The tenor of defendant's argument however, perhaps unwittingly, is that the state knew of the existence and identity of Nichols when it responded to defendant's earlier request for discovery pursuant to Rule 25.32. Assuming, arguendo, that the state previously knew of the existence and identity of Nichols, an erroneously assumed fact which lies at the core of defendant's argument, it is patently clear that the imposition or non-imposition of a sanction authorized by Rule 25.45, supra, for failure to comply with a request or order for discovery rested in the sound discretion of the trial court. The rule itself says so. Rule 25.45, supra, captioned "Sanctions", reads: "If at any time during the course of the proceeding it is brought to the attention of the court that a party has failed to comply with an applicable discovery rule or an order issued pursuant thereto, the court *may* order such party to make disclosure of material and information not previously disclosed, grant a continuance, exclude such evidence, or enter such other orders as it deems just under the circumstances. Wilful violation by counsel of an applicable discovery rule or an order issued pursuant thereto may subject counsel to appropriate sanctions by the court." (Emphasis added.) Likewise, cases applying it have said so. *State v. Sykes,* 559 S.W.2d 643, 646 (Mo. App.1977); *State v. Helms,* 559 S.W.2d 587, 590 (Mo.App.1977), and *State v. Moten,* 542 S.W.2d 317, 320 (Mo.App.1976). Defendant's argument notwithstanding, Rule 25.-45, supra, does not automatically require the imposition of one of the sanctions authorized therein when a party fails to comply with a proper request or order for discovery. As pointed out in *State v. Helms,* supra, at p. 590, whether or not a trial court has abused its discretion in not imposing a

sanction authorized by Rule 25.45 is tested in terms of the nature of the charge, the evidence presented by the state, the role which the nonproduced information would likely have played, and whether the nonproduced information was of such character that a reasonable likelihood existed that if produced earlier it would have affected the outcome of the trial. The record discloses that the trial court approached the state's request to endorse Nichols' name on the information as an additional state's witness with a commendable sense of caution and care, and the late endorsement was not permitted until after defense counsel had interviewed the proposed witness and favorably reported back to the court. At that point of time defense counsel himself effectively convinced the trial court that no prejudice would inure to defendant by permitting the late endorsement of the witness. Without hesitation or equivocation it may be said that the trial court's handling of the matter was the very antithesis of an abuse of discretion.

Getting down to the real crux of the matter, Rule 24.17, addressing the endorsement of the names of witnesses on indictments and informations, although never mentioned by either party, provides, inter alia, that "[t]he names of other witnesses *may* be added at any time upon order of the court and after notice to the defendant or his attorney of record. . . ." (Emphasis added.) In conjunction with this segment of Rule 24.17, supra, an order permitting late endorsement of the name of a witness on an indictment or information is not deemed to constitute an abuse of discretion where there is no showing that prejudice inured to the defendant from doing so. *State v. Strawther,* 476 S.W.2d 576, 579 (Mo.1972). As heretofore pointed out, no prejudice from doing so was ever shown by defendant. As a matter of fact, the record affirmatively demonstrated that doing so did not prejudice him. Defendant's third point is entirely without merit.

■ Defendant advances an amazing and extraordinary proposition in his fourth and final point—that the trial court erred in "failing to direct a verdict of acquittal in favor of defendant during the [closing] argument of the prosecuting attorney" because of the latter's comment "on the failure of the defendant to report to law enforcement officers from the date of the homicide until February 3, 1977". During the trial defendant took the stand and testified in his own behalf. His testimony, with certain minor exceptions, corresponded with the extrajudicial statement he made to the Sheriff of DeKalb County. The following questions were put to the defendant by the state, *without objection,* during cross-examination, and defendant responded with the following answers:

"Q From the time of July 22nd, 1976, until the time of the F.B.I. investigation on February 3rd, 1977, did you ever contact any law enforcement people?

A No, Sir.

Q Did you ever tell any of them that you'd killed a man but it was in self defense?

A You mean before?

Q Before February the 3rd?

A No, Sir."

During his closing argument to the jury the prosecuting attorney, obviously alluding to the above, made the following statement: "He admitted that from July, 1976, until February, he called no law enforcement people." Defense counsel immediately interrupted the prosecuting attorney at that point, beckoned him to approach the bench, and out of the presence of the jury objected to the line of argument immediately heretofore referred to. Defense counsel's objection was sustained, and the trial court cautioned the prosecuting attorney to refrain from any further reference to "defendant's silence". This was an isolated incident, and the subject was never again touched upon or mentioned. Although defense counsel objected to the complained of line of argument, and had his objection sustained by the trial court, he sought no further relief of any kind. He did not ask the trial court to strike the statement, or to instruct the jury to disregard it, or to declare a mistrial.

It is particularly noteworthy that defense counsel did not request the amazing and extraordinary relief he now appears to be pursuing, namely, outright acquittal by reason of the complained of statement. Defense counsel's objection, not having been joined with or followed by a request for any type of specific relief, conjoined with the action taken by the trial court, can only be construed, at best, as an implied request for limited relief, i. e. that the prosecuting attorney cease and desist from making any further reference to the complained of subject matter. That was done. Defendant is in no position to presently complain that he was entitled to some further relief. *State v. Lafferty,* 415 S.W.2d 792, 795 (Mo.1967). Defendant's fourth and final point fails to afford any ground for relief.

Judgment affirmed.

All concur.