**STATE of Missouri, Respondent,**

v.

**David G. SIMMS, Appellant.**

**No. KCD 30598.**

Missouri Court of Appeals,
Western District.

June 9, 1980.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 8, 1980.

Application to Transfer Denied
Sept. 9, 1980.

Clifford A. Cohen, Public Defender, Gary L. Gardner, Kevin R. Locke, Asst. Public Defenders, Kansas City, for appellant.

John Ashcroft, Atty. Gen., Bruce E. Anderson, Asst. Atty. Gen., Jefferson City, for respondent.

Before KENNEDY, P. J., and PRITCHARD and SWOFFORD, JJ.

SWOFFORD, Judge.

The appellant, David G. Simms (defendant), was charged and tried for Murder, Second Degree, arising from the death by shooting of Vernon Gipson. He was found guilty by the jury and sentenced to 15 years in the custody of the Missouri Division of Corrections. After an unavailing motion for a new trial, the defendant timely appealed and here asserts a single point of error, namely,

"THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION FOR JUDGMENT OF ACQUITTAL AT THE CLOSE OF ALL THE EVIDENCE, BECAUSE THE EVIDENCE WAS INSUFFICIENT TO SUPPORT A CONVICTION OF MURDER IN THE SECOND DEGREE IN THAT ALL OF THE EVIDENCE IN THE CASE UNDISPUTEDLY (SIC) AND UNCONTRADICTEDLY (SIC) DEMONSTRATED THAT APPELLANT SHOT IN SELF DEFENSE."

It should be noted that this cause was submitted to the jury under approved instructions embodying the element of self-defense, and the defendant did not (and does not now) raise any objection as to the form or content of such submission. Rather, he takes the positive and thus narrow position that all the evidence as a matter of law established that he shot in self-defense and was therefore entitled to a directed verdict of acquittal of the charge of homicide. Before reviewing the evidence, it is well to keep in mind the controlling law pertinent to this point.

■ It is well settled, and the courts have repeatedly emphasized, that there are certain factual elements which are necessary to establish self-defense in homicide cases, namely, 1) an absence of aggression or provocation on the part of the slayer; 2) there must be the presence of real or apparently real necessity to kill in order to save oneself; 3) a reasonable cause must exist for belief of such necessity; 4) the slayer must have done everything in his power consistent with his own safety to avoid the danger and avert the necessity, and he must retreat, if retreat is practicable; and 5) he must not use more force than reasonably appears necessary to him under the circumstances to resist the danger with which he believes he is confronted. *State v. Jackson,* 522 S.W.2d 317, 319[3] (Mo.App.1975); *State v. Davis,* 572 S.W.2d 243, 246[1] (Mo. App.1978); and cases cited therein.

■ What constitutes self-defense in a particular case, as an abstract principle, is generally a question of law, *State v. Rash,* 359 Mo. 215, 221 S.W.2d 124[1] (1949), and not a question of fact for the jury. However, only when all of the evidence is undisputed and clear should a court dispose of a murder or manslaughter charge by acquittal without tendering the issue of self-defense to the jury. *State v. Blockton,* 526 S.W.2d 915, 918[4–6] (Mo.App.1975); *State v. Meaney,* 563 S.W.2d 117, 120[8] (Mo.App. 1978). As was expressed by the court in *State v. Jackson, supra,* at l.c. 319[2]:

" * * * But *where the evidence is conflicting or of such a character that different inferences might reasonably be drawn therefrom,* it is generally a question of fact for the jury to determine whether the accused acted in self-defense

in a particular case. (cases cited) * * Rarely, then, is self-defense declared by law so as to bar the submission of the homicide offense altogether." (Emphasis supplied)

See also: *State v. Hammonds*, 459 S.W.2d 365, 368[4] (Mo.1970).

The evidence in this case consisted of ten witnesses for the state and the defendant. As is frequently the case in a shooting such as that involved here, much of the testimony is rambling, lacking in clarity, and divergence exists as to some of the details surrounding the tragedy, but the key events emerge into a comprehensible scenario.

On May 25, 1978, at around 10:30 in the evening, the victim, Vernon Gipson, and his girlfriend, Sandra Harris, were driving in Gipson's car on Bellefontaine southbound at or near 42nd Street. They came upon a blue Nova which was stopped in the middle of the street, blocking passage. This Nova was driven by Paul Holloway with the defendant riding as a passenger in the front seat. Both were armed with revolvers. Words were exchanged between the two cars; and appellant threw a can of Coke into the Gipson car, but did not hit either Ms. Harris or Gipson.

Gipson and Harris proceeded to the house of a friend, Ronnell Douglas, and then went with Douglas to the house of Harris' brother, Brodus Harris, at 4303 Bellefontaine, the second house south of 43rd on the east side of the street. Holloway and Simms apparently went for a ride and somewhat later stopped for a chat at 43rd and College with one Anthony Adams. Appellant claims that he was warned of imminent danger by Adams, as follows:

"He stated that some gentlemen had came down the street with some long-barrelled guns and they were looking for us."

The defendant in his statement to the police stated that Adams had identified one of these "gentlemen" as one Eddie Williams, who lived on the corner at 4300 Bellefontaine and was waiting outside for a neighbor, Lawrence Craddock, to arrive home from work to arrange for a ride to a forthcoming picnic. The blue Nova in which the defendant was a passenger drove up and stopped, and the defendant, with whom Williams was acquainted, according to Williams' testimony, asked him "if I was going to get him or something", and "I said no. He ain't did nothing to me". The defendant then asked Williams "who was that" and Williams looked to the south and saw Vernon Gipson walking north along the sidewalk with another man. He saw no gun carried by the victim or his companion. Williams did not say what his response, if any, was to the last question. As he started toward his house, he heard gunfire, and dove into the grass. He did not see the actual firing but when the Nova left the scene, the victim was on his back on the sidewalk, bloodied, and Williams ran to his house to call the ambulance.

Craddock testified that after his conversation with Williams on the corner, he walked to the south toward the Harris house and passed the victim and another man, whom he did not know, walking in the opposite direction. The victim inquired of Craddock "Was that them", to which Craddock replied he didn't know what Gipson was talking about. Craddock stated that he did not see the victim with a gun or "anything like that" when he passed. When Craddock was on the walkway to the Harris porch, he heard gunshots at the corner.

Before the shooting there were several persons on the Harris front porch visiting. This porch was close to the corner and the corner was visible from there and was well lighted by street lights. There was some evidence that the Holloway blue Nova had been seen on the street between the time of the traffic incident at 10:30 p. m. with the victim and Sandra Harris and the 1:30 a. m. shooting. Just before the shooting, the victim, Gipson, left the porch and walked toward the corner. There was some divergence in the evidence as to whether he was alone or in the company of another of those at Harris' house. None of the persons at the Harris home saw any weapon in the victim's possession that night or saw him brandishing a gun as he approached the Nova, or observed him fire a gun during the

shooting. Ronnell Douglas, Brodus Harris, and Sandra Harris saw and heard gunfire coming from the passenger side of the Nova.

LeRoy Livingston, who had no connection with anyone involved in this matter, was driving his automobile south on Bellefontaine and was stopped for a stop sign at the northwest corner. He testified that he observed the blue Nova automobile stopped to the south of 43rd Street on the east side of Bellefontaine. It next pulled around the corner to the right and he saw these "three guys" run to the side of the car, and that's when the gunfire started. He stated that two of the men on foot, and possibly all three, were shooting, and both men in the car were shooting. His testimony is the only evidence, other than that of the defendant, which indicates that shots were fired by anyone other than the occupants of the Nova.

Greg Russell, a member of the Kansas City, Missouri Police Department, was dispatched to the scene and was the first officer to arrive, within minutes of the shooting. He roped off the area and searched for weapons and bullet marks at the scene, and found none. He also testified that he had talked to LeRoy Livingston at the scene and that Livingston did not tell him he had observed the male pedestrians on the corner shooting at the occupants of the Nova. The evidence further showed that there were not bullet marks or holes in the Nova automobile, and that neither of the occupants thereof, nor anyone else at or near the corner, were wounded during the "battle" of five persons (according to Livingston) shooting it out.

The defendant testified that he lived at 4212 College, about three blocks from the scene of the shooting, and that he arrived at his home from work around 9:00 p. m. on May 25, 1978. A little later, he was "messing around with a firearm" in his neighbor's front yard when Paul Holloway came by and they went riding. He took his gun to Holloway's car and Holloway was also armed. Holloway's car "conked out" on the 4200 block on Bellefontaine and a Chevrolet auto pulled up behind and the occupants "demanded us to move". The driver of that car said, "Are you trying to be funny", and he appeared "to be reaching under the seat to get something", and the lady passenger said "No, no, it's not worth it". He testified he had gone to high school with Sandra Harris, but did not know the driver. Ms. Harris' version of this occurrence is vastly different.

The defendant stated that he and Holloway followed it east on 43rd Street and when they tried to pass it, the Chevrolet blocked the street. Finally, upon passing, he threw a Coke can into the Chevrolet.

After this incident and later in the night, Holloway and the defendant returned to the 43rd and Bellefontaine area, and he related his conversation with Tony Adams as heretofore noted, about the men with "long rifles". Even later, just before the shooting, he and Holloway were parked at 43rd, talking to Eddie Williams. He did not relate any of the details of his conversation with Williams except that after he had seen a person walking toward the car along Bellefontaine, and another person approaching from the street, Eddie Williams said, "You better go. That's the guy", and the defendant said to Holloway, "Let's go". The person coming toward the car was running and shouting, "I'm going to kill you" and "I'm going to get you". He was aiming his gun at defendant's head. As the Holloway car commenced to make a slow right turn east on 43rd, the defendant stated the man fired, the defendant reached below the seat and got his gun, crouched behind the car door and "shot back". Holloway was also firing his gun. The defendant's statement, given to the police, was introduced as evidence, and it did not contain an account that the victim had shouted the threats above related. Holloway did not testify in the case.

When the gunfire was over, Gipson lay dead on the sidewalk, shot through the chest, the defendant was arrested later that morning, at his home, and the murder weapon was recovered from his bedroom.

The State offered no evidence in rebuttal.

■ In this state of the record and as a preliminary to disposition, this Court recognizes the fact that self-defense is a unique

concept of criminal law so far as it relates to the burden of proof. MAI-CR refers to it as a "special negative defense and places the burden of proof on the State to prove that the defendant did not act in justifiable self-defense". MAI-CR 2.40. A *caveat* is added, "However, this does not mean the State is required to come forward with additional evidence after the defendant produced evidence of self defense or justifiable homicide. The burden cast on the State by this instruction can be met by the evidence produced in the State's case in chief just the same as the other issues which the State is required to prove can be shown". *State v. Willett*, 539 S.W.2d 774, 778–779[10] (Mo.App.1976). The matter of credibility is intrinsically involved in this principle since the jury is permitted to disbelieve the testimony of the defendant as to the necessity for his actions, and the State need not contradict each factual allegation. *State v. Blair*, 531 S.W.2d 755, 760–761[9] (Mo.App. 1975). See also: *State v. Dill*, 282 S.W.2d 456, 460[3] (Mo.1955).

■ Any reasonable view of the evidence in this case leads to the inevitable conclusion that the issue of self-defense was properly submitted to the jury in view of the fact that such defense was not established by clear and "undisputed and uncontradicted" evidence as claimed by the defendant. To the contrary, the evidence on several material factual points, and reasonable inferences to be drawn therefrom, was in sharp conflict, and the credibility of the defendant and the witness Livingston bore close scrutiny.

For example, was the victim armed as he approached the Holloway Nova automobile so that he was equipped to place the armed defendant in fear of his life, pointing his firearm at defendant's head and pulling the trigger as the victim shouted threats to "kill" defendant? There was abundant evidence that the victim had not been armed at anytime during the time span encompassed in the evidence, including the testimony of Ms. Harris, who had been with him constantly for several hours, those who had been in his company at the Harris home, those that contacted him or saw him as he approached the Holloway car just before

the gunshots, and the policemen who searched the area and the victim within minutes of the encounter. The only person who places a gun in the victim's possession is the defendant, with dubious support from Livingston, who, coming upon the shooting and within range was undoubtedly afraid and confused. He testified that two or "possibly all three" of the pedestrians were shooting at the Nova's occupants. Indeed, the defendant admits that the victim left the Harris porch (within a short distance from the corner) unarmed.

In the appellant's Brief, at page 4, it is stated:

"Vernon Gipson left the porch of 4303 Bellefontaine alone and *unarmed*. No weapon was found at the corner." (Emphasis supplied)

Appellant's Brief at page 8, states:

"Gipson left from the porch he was on, inquired of Craddock whether it was appellant in the blue Nova, and approached the automobile *with a second person. Either Gipson or the unknown other person* yelled 'I'm going to kill you', pointed a handgun in appellant's face and pulled the trigger." (Emphasis supplied)

The evidence raises serious conflicts and doubts, to be resolved by a jury, as to whether the victim or any of the persons outside the Nova ever fired any shots. Here again, the only evidence that such shots were fired came from the defendant and Livingston in the face of substantial evidence, both testimonial and physical, that such shots were not fired.

Another factual record which would reasonably support an inference that the defendant did lack the self-defense qualification of "an absence of aggression" finds support in the rather bizarre activities of the armed defendant between the traffic incident and the shooting and his presence in the area of 43rd and Bellefontaine, even after warning of "gentlemen" with long-barrelled guns "looking for him". This conduct and his inquiries of Williams would justify the conclusion that he was "stalking" the person involved in the traffic dispute or "looking for him" with rifles and was "spoiling for trouble". Was this con-

sistent with his obligation to do everything in his power to protect his own safety and to avoid danger, a prerequisite for resort to the plea of self-defense? When confronted with the immediate danger as he related at the scene, did he retreat as required by the doctrine? Does driving "slowly" around a corner while both he and Holloway fired at the men on the sidewalk, whom they could easily and quickly outdistance, constitute such a retreat?

There are numerous other areas of conflict in the record, and the above are merely pointed out as examples to demonstrate that the record here does not, as defendant asserts, support his claim to self-defense by all of the undisputed and uncontradicted evidence or reasonable inferences which could be drawn therefrom.

The court below properly denied the defendant's motion for a judgment of acquittal at the close of all the evidence and submitted the issue of self-defense to the jury.

The judgment is affirmed.

All concur.