**STATE of Missouri, Respondent,**

**v.**

**Jesse SCOTT, Appellant.**

**No. 55857.**

Supreme Court of Missouri, En Banc.

May 8, 1972.

John C. Danforth, Atty. Gen., Gene E. Voigts, First Asst. Atty. Gen., Jefferson City, for respondent.

George A. Adolf, St. Louis, for defendant-appellant.

DONNELLY, Judge.

Appellant, Jesse Scott, was convicted of murder in the first degree by a jury in the Circuit Court of the City of St. Louis, Missouri, in connection with the death, on March 31, 1969, of one Charles Thomas at 4416 Red Bud in St. Louis.

The question on this appeal is whether appellant was entitled, upon request prior to and during trial, to inspect the substance of an oral statement concerning "this particular homicide" made by appellant to Detective Herbert Riley on November 18, 1969.

*The following transpired during direct examination of Detective Herbert Riley before the jury:*

"BY MR. McDONALD:

"Q   Will you state your name, please?

"A   Detective Herbert Riley.

"Q   And you're a member of the Metropolitan Police Department, is that correct, of St. Louis?   A   That's correct, I am.

"Q   And how long have you been a police officer?

"A   Fourteen years.

"Q   Are you assigned to any particular unit here in St. Louis?

"A   Homicide.

*        *        *        *        *        *

"Q   During the course of your years there at Homicide, and more specifically directing your attention to 1969, did you assist in the investigation of the homicide of Charlie Thomas?

"A   I did.

"Q   And did you arrest or assist in the arrest of a Jesse Scott?   A   I did.

*        *        *        *        *        *

"Q   (By Mr. McDonald) Now, Officer, where did you arrest Jesse Scott?   A   In Chicago, Illinois.

"Q   And specifically where did you go to get him?

"A   At 1111 State Street, Chicago Police Headquarters in Chicago, Illinois.

"Q   What was the date of that arrest? A   November 17, 1969.

"Q   November 17, 1969?   A   Yes.

*        *        *        *        *        *

"Q   And do you recall the time of day that you left Chicago?

"A   As I recall, it was sometime around eleven a. m., maybe shortly thereafter.

*        *        *        *        *        *

"Q   How long did it take you to get back to St. Louis?

"A   We arrived back in St. Louis to Police Headquarters shortly afer five p. m.

*        *        *        *        *        *

"Q   Did you have occasion ever to see Mr. Scott again concerning this homicide? A   The following morning.

*        *        *        *        *        *

"Q   What then, if anything, did he tell you on the morning of November 18, 1969?

"A   Jesse Scott told me that about two days before the fatal stabbing of Charlie Thomas, a friend of his whom he declined to name for personal reasons had came to him and told him about an old man who lived over on Red Bud, and he thought that the old man might have some money as he owned some property, and wanted Jesse to go with him to stick the old man up. Jesse asked him where the old man lived, after which his friend took him over to Red Bud and pointed to a house, 4416 Red Bud.   Jesse said at this time when he observed this house, he recognized this house as being the house of his brother-in-law's grandfather.   Jesse said that he then told his friend that he knew the old man.   'Let's leave him alone.'

*        *        *        *        *        *

"Q   What else did he tell you at that time?

"A   He said that after indicating to his friend that he knew the old man, to leave him alone, they decided to walk away. He said the following day he again seen this friend of his at which time his friend says that he had an idea that might work and no one would get hurt.   He said he knew enough about the old man that the old man wouldn't let him in unless they could make the old man think that they knew the same people, so Jesse said that his friend said 'Well, I'll use your name and gain entrance that way' and he says 'Then, I'll go in and I'll stick him up and after the old man tells the police that

Jesse Scott did it, the police will pick you up and when they put you in the showup the old man won't be able to identify you, and we'll all be free, everything will be all right.' So Jesse stated that he had just lost his job, needed some money, that he thought it would be all right.

"So, he and—Jesse said that he and his friend then walked over to the old man's house at 4416 Red Bud where his friend went up and knocked on the door. He said, however, he didn't receive any answer so they both walked away.

"Q   Did he indicate when that occurred?

"A   This would be the day before, which would have been, I believe Jesse said on a Tuesday, which was the 30th of March.

"Now, Jesse continued that the following day, which was the day of the incident, March 31st, sometime around six p. m. or so, he and his friend had been in a tavern—I believe it was called the Leopard Room—at Fair and Lee, when Jesse stated that his friend said 'Do you want to try it again' at which time Jesse stated he agreed.

"So, they then went back over to 4416 Red Bud where Jesse stated his friend went up to the front door while Jesse states that he stood behind a tree by the sidewalk in front of the house. This friend went up and knocked on the door, and after a minute or so the old man opened the door. The friend and the old man talked for a minute or so, and then his friend went inside. Jesse said, at this time, once his friend got inside with the old man, Jesse stated that he then walked back to Fair and Lee to the Leopard Room Tavern in order to establish an alibi in case the police would later question him as to his whereabouts.

"He said while he was in the Leopard Room he talked to the barmaid named Cooky and the owner of the tavern named Pat.

"Jesse stated about an hour or an hour and a half later he received a phone call from his friend.

\*   \*   \*   \*   \*   \*

"Q   (By Mr. McDonald) Now, Officer, did the defendant tell you how long it was, how long he waited there at the bar before he heard from his friend?

"A   He stated an hour, an hour and a half.

"Q   Now, at that time did he indicate to you what this friend—he still won't tell us who he is—what this man told him on the phone?   A   Yes.

"Q   What did he say?

\*   \*   \*   \*   \*   \*

"A   He stated that he thought that he had killed the old man. Jesse stated he asked him where he was at. Jesse said that he was told. He then went to meet his friend. He didn't say where he met him at. Once he met his friend, he noticed that the friend was bleeding about the head and that there was blood on his clothing. Jesse stated that he asked him what happened. He said that his friend had told him that once he got inside—

\*   \*   \*   \*   \*   \*

"Q   (By Mr. McDonald) Go ahead.

"A   He stated that once he got inside that he—

"Q   When you use the word 'he'—

"A   This is the friend. Once the friend got in, the friend and the old man went into the kitchen and sat at the kitchen table and talked for about fifteen minutes; and that he, the friend, then pulled his knife and put it up to the old man's neck and said 'This is a stickup'. He said at this time the old man pushed him away, and they started to struggle. He said the old man then picked up a stool and hit him across the head. He said the old man then drew the stool back over his head as if to hit him again. However, when he drew the stool back this time, the stool hit the glass in the rear door and broke the glass. He said that the old man then hit him once again. He said that the friend said that he became dizzy and the

old man kept—the old man now started hitting him with his fists. He said that he tried to get away; however, was unable to do so as the old man continued to hit him. Jesse said his friend said he then started sticking the old man with a knife; and as the old man continued to hit him with his fists, he continued to stab him and stab him. He said then he managed to break away.

"He said he searched some drawers in the house looking for money; however, he couldn't find any. He said he did find a shotgun sitting in a corner in one of the rooms, and which he took.

"Jesse stated that he and his friend were both frightened at this time because Jesse stated that his friend had cut the old man and Jesse had known that his friend had used his name to gain entrance, so they were both frightened.

"He went on to state that the following day he learned that the old man had died. Well, Jesse stated that they hid the knife with the thought in mind that they would dispose of it later.

"Q Did he indicate to you, Officer, when he said that they hid the knife where they hid it? A No, he never would tell me.

"Q Did he state whether or not they had disposed of the knife?

"A He said that they had hid it and were to dispose of it later."

*The following transpired during cross-examination of Detective Herbert Riley before the jury:*

"BY MR. ADOLF:

"Q Now, Officer Riley, you took down notes as Jesse Scott was talking to you for those forty-five minutes, didn't you?

"A That's correct.

"Q And do you have those notes with you?

"A No. The Court has them.

\* \* \* \* \* \*

"Q And who prepared the police report? A I did.

"Q You reviewed that also, I guess. A Yes, sir. Yes.

"Q And where is that? A The court records. The Court has it.

"Q And what was the other thing that you were referring to? You asked me whether I was talking about the report or was I talking about—

"A Talking about the notes that had been made at the time of the interview on legal paper, such as you have there.

"Q Yellow legal paper? A Right.

"Q How many pages are those? A Three or four.

"Q That's in your handwriting? A Yes, sir.

"Q Not in Jesse Scott's handwriting? A My handwriting.

"Q Not in his handwriting? A No.

"Q He didn't put his initials on there at any place, did he?

"A No.

"Q He didn't sign it? A. No, sir.

"Q You didn't tape-record anything he said, did you?

"A No, sir.

"Q So the only record you have of what he said is in those notes. A That's correct.

"Q And you've done this many times before, haven't you, questioned people about offenses? A That's correct.

"Q And is this your regular procedure, that you take notes?

"A Yes, sir."

In State v. Johnson, 28 N.J. 133, 145 A.2d 313, 315, 316 (1958), appears language particularly appropriate here:

"We start with the premise that truth is best revealed by a decent opportunity to prepare in advance of trial. We have embraced that tenet with respect to civil litigation, and absent overriding considerations, it should be as valid in criminal matters. It is of no moment that pretrial inspection is not constitutionally assured. Cicenia v. La Gay, 357 U.S. 504, 78 S.Ct. 1297, 2 L.Ed.2d 1523 (1958). We are not limited to constitutional minima; rather we strive for practices which will best promote the quest for truth. It may be added that although Cicenia v. La Gay found the Fourteenth Amendment to be unoffended, yet it observed that 'it may be the "better practice" for the prosecution to comply with a request for inspection.' 357 U.S. at page 511, 78 S.Ct. at page 1301, 2 L.Ed. 2d at page 1529.

"It is difficult to understand why a defendant should be denied pretrial inspection of his own statement in the absence of circumstances affirmatively indicating disservice to the public interest.

"If a suspect refused to give a statement unless assured a copy, it would be an injudicious prosecutor who would not agree. And if the suspect were then represented by competent counsel, that stipulation would be required. Why, then, should the State refuse a copy to the suspect who was unrepresented and uninformed?

"We must be mindful of the role of a confession. It frequently becomes the core of the State's case. It is not uncommon for the judicial proceeding to become more of a review of what transpired at headquarters than a trial of the basic criminal event itself. No one would deny a defendant's right thoroughly to investigate the facts of the crime to prepare for trial of *that event*. When a confession is given and issues surrounding it tend to displace the criminal event as the focus of the trial, there should be like opportunity to get at the facts of the substituted issue. Simple justice requires that a defendant be permitted to prepare to meet what thus looms as the critical element of the case against him.

"[2] The need for an opportunity to prepare to deal with a defendant's statement must be evident. If voluntariness is in issue, the content of the confession may be revealing. Counsel would need time to explore thoroughly the truth of the factual assertions therein, to inquire whether it contains anything more than the State knew at the time when defendant was apprehended, and to consider whether the content itself supports or negates the defendant's claim of involuntariness. Pretrial inspection may be equally necessary even though defendant concedes he freely gave the statement. This is so because the impact of the statement upon guilt may turn upon how the facts are stated, or upon the absence of exculpatory facts which a defendant may claim were revealed to the interrogator or would have been revealed if the inquiry had been complete. In murder cases in which guilt is not disputed, the manner of expression or the omission of palliative circumstances may have additional significance because of their influence upon the jury's determination as to punishment. Or the confession may contain prejudicial material which should be exscinded and as to which counsel should not be required to make a hurried decision in the courtroom. The possible situations may be multiplied. The virtue of the adversary approach to a trial lies precisely in the opportunity for a full and fair presentation, and hence where the State has had a unilateral examination of a defendant, he should be enabled, as far as feasible, to prepare to explore the completeness and fairness of a policeman's or prosecutor's development of the story in the confession."

We are of the opinion that, in the circumstances of this case, appellant's trial was rendered "fundamentally unfair"

(State v. Aubuchon, Mo.Sup., 381 S.W.2d 807, 814) when appellant was refused inspection of the substance of oral statements made by appellant to Detective Riley. We find an abuse of discretion and prejudicial error.

The judgment is reversed and the cause remanded.

All concur.