**STATE of Missouri, Respondent,**

v.

**Ricky SMOTHERS, Appellant.**

**No. 61299.**

Supreme Court of Missouri,
En Banc.

Sept. 9, 1980.

Rehearing Denied Oct. 15, 1980.

Arthur T. Stephenson, Caruthersville, for appellant.

John Ashcroft, Atty. Gen., Jan Bond, Asst. Atty. Gen., Jefferson City, for respondent.

HIGGINS, Judge.

Ricky Wayne Smothers, with prior convictions for burglary and stealing, was convicted by a jury of murder, first degree. § 556.280, RSMo 1969; § 565.003, RSMo 1978. The court fixed his punishment at life imprisonment; sentence and judgment were rendered accordingly. Appellant contends that a failure of disclosure and prejudicial pretrial publicity entitle him to a new trial. Affirmed.

Appellant does not question sufficiency of the evidence to support conviction; and the following statement is sufficient to present this appeal.

A jury reasonably could find from the evidence that in the early morning hours of September 3, 1978, Ricky Smothers and Gary Ward went to the house of Lela Tuggle in Kennett, Missouri. Ward entered the house through a bedroom window. Mrs. Tuggle awoke and turned on a light. At Ward's request, Mrs. Tuggle allowed him to use the phone and to let defendant in the front door. Defendant grabbed Mrs. Tuggle, demanded money, and dragged her into the kitchen. She called to her 89–year–old mother, Mrs. Rosa Runsick, who was in a bedroom. Defendant ordered Ward to kill Mrs. Runsick, and Ward went to the bedroom, hit her, and began to choke her. When he returned to the kitchen he told defendant he had killed her, though he had not. Defendant then strangled Mrs. Tuggle with a towel which he left knotted around her neck. The assailants fled taking a purse and a mirror which they threw into a nearby ditch. Later that morning Mrs. Runsick went to a neighbor who called the police.

Chief of Police Cox arrived at the scene shortly after 8:00 a. m. He found Lela Tuggle's body on the floor of the kitchen and Mrs. Runsick in an "incoherent state . . . unable to furnish . . . any-thing at all about what took place the night before." Mrs. Runsick was taken to a hospital for treatment. Upon her release she went to Wichita, Kansas, where she remained with a daughter.

On September 19, 1978, Gary Ward was arrested for an unrelated offense. While in jail he told a trusty where the purse and mirror could be found. He later gave a statement in which he admitted his part in the homicide and implicated defendant.

Prior to trial, defendant requested pursuant to Rule 25.32 (present Rule 25.03) that the state disclose,

the names and last known addresses of persons whom the state intends to call as witnesses at any hearing or at the trial, together with their written or recorded statements, and existing memoranda reporting or summarizing part or all of their oral statements.

At some time prior to trial, defendant's counsel was informed that Mrs. Runsick was in Wichita, Kansas, and that the prosecuting attorney had obtained no statement from her.

On January 22, 1979, approximately two weeks before trial, an investigator for the state went to Wichita and took a taped statement from Mrs. Runsick in which she stated that there were two males involved in her daughter's death. On February 1, 1979, the prosecutor supplied defense counsel with copies of taped statements of three state's witnesses; the Runsick tape was not disclosed.

Defendant moved for and was granted a change of venue from Dunklin to Stoddard County. On January 29, 1979, he disqualified the regular judge, and Judge Seier was designated special judge. Two days later, the disqualified judge, in an interview with a reporter for the daily paper in Stoddard County, stated that the defendant was to be tried as a second offender, that upon conviction the judge would assess punishment, and that when he was disqualified, he had appointed a tougher judge to try the case.

On February 5, 1979, defendant requested an additional change of venue from Stoddard County on account of the newspaper article. Voir dire of the jury panel was conducted after which a mistrial was declared. Defendant's motion for a change of venue was granted, and the trial commenced the following day in Cape Girardeau County.

The third witness at trial was Mrs. Runsick who testified that on the morning of September 3, there were "two boys" who entered the house and "choked her [Lela Tuggle] and killed her." Following defense objection a conference was held out of the hearing of the jury. Defense counsel stated to the court that the last he had heard, Mrs. Runsick was incoherent and could give no statement. Following lengthy colloquy, the prosecutor stated that he "had an oral statement of Mrs. Runsick." Defense counsel requested a mistrial on grounds of surprise and that the testimony was damaging. The trial court refused to grant a mistrial but offered defense counsel the opportunity "to interrogate Mrs. Runsick privately before he was required to cross–examine her." When he attempted to do so, however, she refused to cooperate, apparently on the advice of her daughter.[1]

In colloquy following defense counsel's conference with Mrs. Runsick, the prosecutor stated:

Your Honor, it has just come to my attention, and I did know at one time, that my Investigator, of course he went to Wichita, and I think I told Art [defense counsel] that; I know I told everybody else in Kennett, it's been widely known and there was certainly no conspiracy to keep that a secret. My Investigator did take a taped statement from her when he was in Wichita. I can't specifically recall listening to it. He told me what occurred there. A taped statement was made.

Defense counsel renewed his motion for mistrial and alternatively for exclusion of the testimony of the witness. The court, in denial of both requests, stated:

I have in mind granting a continuance until such time as the Prosecutor provides that tape to you and provides you ample opportunity to listen to the tape before you continue your cross, before you cross examine the witness.

The tape was produced and the trial court announced it would continue the recess until counsel had the opportunity to listen to the tape. After he listened to the tape, defense counsel announced that he had had sufficient time to review the tape,[2] and waived the right to cross–examine the witness.

Appellant charges the trial court erred in refusing to declare a mistrial after it became known that the prosecutor had failed to disclose the taped statement of Mrs. Runsick. He argues that the failure to disclose resulted in a violation of defendant's right to a fair trial.

 Failure by the prosecution to disclose the tape of Mrs. Runsick after defendant's written request was a violation of the discovery rules. The duty to disclose is a continuing one, *State v. Curtis*, 544 S.W.2d 580 (Mo. banc 1976); it is not discretionary, *State v. Stapleton*, 539 S.W.2d 655 (Mo.App. 1976). The question remains, however, whether the failure to disclose resulted in fundamental unfairness or prejudice to defendant. *State v. Moten*, 542 S.W.2d 317, 320 (Mo.App.1976). When non–compliance with an applicable discovery rule is brought to the attention of the court, the trial court is given the discretion to "order . . . disclosure . . ., grant a continuance, exclude such evidence or enter such other orders as it deems just under the circumstances." Rule 25.45 (present Rule 25.16). The trial court is not required to apply the drastic remedy of a mistrial simply because the statement has not been produced. *State v. Johnson*, 524 S.W.2d 97, 101 (Mo.

---

1. This difficulty was not reported to the court prior to the hearing on defendant's motion for new trial.

2. The pertinent part of the tape was a statement by Mrs. Runsick that "the boy come in, there was two, one a lot bigger than the other, and they were just choking her to death."

banc 1975). Declaration of a mistrial is a remedy reserved for extraordinary circumstances, and not required in a situation of failure to disclose until the remedies specified in the Rule are shown to be inadequate. *State v. Friend*, 570 S.W.2d 817, 819 (Mo. App.1978).

 Appellant's argument suggests willful violation of discovery rules by the state and that the Court should reverse this conviction as a deterrent to prosecuting attorneys' failures to provide complete discovery. At issue in this case, however, is not whether the prosecuting attorney should be disciplined for improper conduct. Where such exists, the remedy does not lie exclusively with declaration of mistrial but may lie appropriately with that portion of Rule 25.45 directed to that purpose:

> Wilful violation by counsel of an applicable discovery rule . . . may subject counsel to appropriate sanctions by the court.

A conviction resulting from a fair trial should not be reversed for the purpose of disciplining and deterring prosecutors, particularly where the mechanism for discipline and deterrence is provided elsewhere.

 The problem thus presented is whether in this case, the trial court's refusal to grant a mistrial resulted in an unfair trial. Defendant had been alerted to the probability of testimony from Mrs. Runsick. She was endorsed as a witness and was present at trial. When the non-disclosure of the pre-trial statement of Mrs. Runsick became known, defendant requested a mistrial. The trial court denied the request but ordered a recess to afford the defense the opportunity to interrogate Mrs. Runsick. Thereafter, the existence of the tape came to light and defendant renewed his motion for mistrial. The trial court again denied the request for mistrial and an alternative motion to exclude the testimony, but ordered production of the tape and recessed the case until there was ample opportunity for the defendant to listen to the tape prior to cross-examination. The tape was produced and defendant listened to it. After that review the defendant waived cross-examination and requested no further relief. He does not now complain of the court's denial of the motion to exclude Mrs. Runsick's testimony. In these circumstances, defendant's waiver of cross-examination without further request for relief following in-trial production of the tape and time for review demonstrate that the late disclosure was treated by the court as provided by Rule 25.45, and that the court's discretion so exercised did not result in fundamental unfairness or prejudice to the substantial rights of the defendant.

 Defendant argues, however, that he relied on the state's assurance no statement had been obtained and went to trial believing that the status of Mrs. Runsick's testimony would be as indicated by Chief Cox at the scene of the crime: that Mrs. Runsick was "in a totally confused state of mind, was incoherent and unable to furnish anything at all about what took place." The status of this woman's testimony became particularly important to defense strategy, he argues, because he told the jury in his opening statement that there would be no believable evidence that the defendant had in any way, participated in the killing and that the state's entire case depended solely upon the believability of a co-defendant. When Mrs. Runsick testified "two boys" were in the house at the time of the crime, it was then too late to prepare to defend against that evidence.

This strategy argument first appears in appellant's brief on appeal. No such basis for mistrial was presented to the trial court at trial or in the motion for new trial; and it cannot be said with certainty that Mrs. Runsick's testimony irreparably damaged defendant's trial strategy as set out in his opening statement.[3] Counsel's statement that there would be no "believable" evi-

---

**3.** "It is the position of this Defendant that there will be and is no demonstrative evidence that anyone other than Gary Ward was in the Tuggle house on September 3, 1978 . . .

[and] there is no believable evidence that the Defendant Ricky Smothers was in any way participating in the death of Lela Tuggle."

dence defendant participated in the killing was not limited in reference to the testimony of Ward. The statement was broad enough to refer to any witness, thus permitting defendant to attack the credibility of the accomplice and the ninety–year–old eyewitness.[4]

The trial court was in the best position to assess the prejudicial effect of the failure to disclose and to determine what remedy was necessary to alleviate any unfairness. Defendant has not shown that Mrs. Runsick's statement was of such a character as to raise a reasonable likelihood that its prior discovery would have affected the result of the trial. *See State v. Couch,* 569 S.W.2d 789, 791 (Mo.App.1978).

■ Defendant contends "pretrial publicity by the court [disqualified judge] immediately prior to the trial of the issues herein, denied the defendant a speedy trial in the forum of his choice . . . and that such denial of venue of his choice was a denial of defendant's right to a fair trial . . . ." He argues that he had exercised his statutory right to a change of venue from the county where the crime occurred and obtained removal to the only other county in the circuit, Stoddard County; that when the disqualified judge thereafter made his statement to the press, it so prejudiced the members of the jury panel that a fair and impartial jury could not be selected; that he was therefore required to request a continuance to allow the effect of the publicity to subside or to request a second change of venue; that either alternative denied him his right to a speedy trial in the venue of his choice.

Defendant has failed to state wherein and why the trial court erred or what further relief the trial court should or could have granted to alleviate any prejudice that resulted from the statement of the disqualified judge. Rule 84.04(d). Suffice to say in support of the trial court's actions that the court complied with defendant's request for change of venue to remove the prejudicial

effect, if any, of the pretrial publicity; and that venue was awarded to Cape Girardeau County where the trial commenced the following day. Defendant had no right to a particular venue and he does not argue, nor is there any indication that the statement in question prejudiced him, or that he was denied a speedy and fair trial in the new venue.

The judgment is affirmed.

RENDLEN, WELLIVER and MORGAN, JJ., concur.

BARDGETT, C. J., dissents in separate dissenting opinion filed.

DONNELLY, J., dissents in separate dissenting opinion filed.

SEILER, J., dissents in separate dissenting opinion filed.

BARDGETT, Chief Justice, dissenting.

I respectfully dissent.

An opinion written by Stockard, C., in Division 2 of this Court failed of adoption after submission of the cause to the Court en Banc. I believe that opinion accurately demonstrates that the failure of the state to comply with the discovery rule in this particular case resulted in an unfair trial. The unfairness of the trial occurred regardless of whether the conduct of the prosecuting attorney was intentional or negligent. It is clear to me that it was at least grossly negligent. I adopt the opinion of Stockard, C., as my dissent in this case and set it forth as follows:

"Charged under the Habitual Criminal Act with capital murder of Lela Tuggle, a 70–year–old woman, Ricky Wayne Smothers was found guilty by a jury of murder in the first degree and was sentenced by the court to life imprisonment.

Appellant does not challenge the sufficiency of the evidence. Therefore we shall set forth only a brief statement of the events.

---

4. The recording of Mrs. Runsick's statement and the transcript of her testimony at trial indicate that she had difficulty understanding questions and was not altogether clear on either past or present events.

A jury reasonably could find from the evidence that in the early morning hours of September 3, 1978, appellant and Gary Ward went to the home of Lela Tuggle in Kennett, Missouri. Ward knocked on the front door but no one answered. He then climbed into the house through a bedroom window. When Mrs. Tuggle turned on a light he told her that he wanted to use her telephone, and at Ward's request she permitted appellant to enter the front door. Appellant then grabbed Mrs. Tuggle, demanded money, and dragged her into the kitchen. She began to yell for her 89–year–old mother, Mrs. Rosa Runsick, who was in a bedroom. Appellant told Ward to kill Mrs. Runsick, and Ward went to the bedroom, hit her and began choking her. When Ward returned he told appellant that he had killed Mrs. Runsick, but in fact he had not. Appellant then used a towel to strangle Mrs. Tuggle causing her death. Ward and appellant left the house and took with them a mirror and Mrs. Tuggle's purse, which they threw into a ditch. Later that morning Mrs. Runsick went to a neighbor's house, and although badly injured and in a confused mental state, she caused the neighbors to investigate and call the police.

Chief of Police Cox arrived at the scene shortly after 8:00 o'clock in the morning. He found Lela Tuggle's body on the floor of the house and Mrs. Runsick in an 'incoherent state' and 'unable to furnish us anything at all about what took place the night before.' Mrs. Runsick was taken to a hospital for treatment, and upon her release she was taken to Wichita, Kansas, where she remained with another daughter.

On September 19, Gary Ward was arrested for an unrelated offense, and while being held in the Dunklin County jail he told a trustee where Mrs. Tuggle's purse and the mirror could be found. Ward later gave a statement admitting his part in the homicide and implicating appellant.

On December 4, 1978, appellant requested, pursuant to what was then Rule 25.32 (now Rule 25.03), that the state disclose, among other things, 'The names and last known addresses of persons whom the state intends to call as witnesses at any hearing or at the trial, together with their written or recorded statements, and existing memoranda, reporting or summarizing part or all of their oral statements.' We do not find in the record before this Court the answers of the state made pursuant to this request. A discussion at trial between the court and counsel indicates that a few days after the above request was filed a conference was had between the prosecuting attorney and appellant's counsel, and that appellant's counsel was informed that Mrs. Runsick was in Wichita, Kansas, and that the prosecuting attorney had obtained no statement from her.

In his opening statement, the prosecuting attorney referred by name to four prospective witnesses, one of whom was Gary Ward who was also charged with the murder of Lela Tuggle, and he outlined the testimony he expected from each. Mrs. Runsick was indorsed as a witness, and in pretrial conferences the prosecuting attorney stated that she would testify. However, in his opening statement the prosecuting attorney did not indicate that there would be any testimony from Mrs. Runsick or that any witness, other than Gary Ward, would testify that more than one person entered the Tuggle house at the time of the homicide. Appellant's counsel then made an opening statement in which he said: 'It is the position of this Defendant that there will be and is no demonstrative evidence that anyone other than Gary Ward was in the Tuggle house on September 3, 1978, * * * [and] there is no believable evidence that the Defendant Ricky Smothers was in any way participating in the death of Lela Tuggle.' It was thus made clear at the time of the opening statements that appellant's defense to the charge against him was that he did not participate in the homicide, and that he was going to rely on the fact that the only testimony that would be presented that he did so would come from a person who had already confessed to the crime.

The first witness for the state was Mrs. Tuggle's daughter who was in Arkansas at the time of the homicide. She identified

the purse and mirror recovered from the ditch to be those of her mother, and she described the layout of the house. The second witness was the doctor who performed the autopsy. The third witness was Mrs. Runsick who testified that on the morning of September 3 there were 'two boys' who entered the house and 'choked her [daughter] and killed her.'

A conference was then held out of the hearing of the jury at which appellant's counsel inquired of the prosecuting attorney 'how long he has known of this testimony of this witness.' Appellant's counsel stated to the court that such information had not been disclosed to him, and he added that 'The only testimony that [he] knew from this Defendant [witness?] was that she was incoherent and could not give any statement.' The prosecutor first stated that he did not 'know what he's [appellant's counsel] talkin' about,' and he added that appellant had filed a motion to disclose names and addresses of witnesses and 'that was done.' Then, in referring to the request for 'written or recorded statements, and existing memoranda reporting or summarizing part or all of their oral statements,' he stated, 'We don't have any of that.' Shortly thereafter the prosecutor admitted that he 'had an oral statement' of Mrs. Runsick, but stated that there was no 'existing summary' of it. Appellant requested a mistrial on the basis that the testimony was 'extremely damaging' and a 'surprise' to him. The trial court refused the mistrial, but stated it would afford defense counsel the opportunity 'to interrogate this witness' (Mrs. Runsick) privately before he was required to cross-examine her. However, when counsel attempted to do so in a conference room one of her daughters told him 'We don't have to tell you anything,' and Mrs. Runsick was instructed by her daughter not to talk to appellant's counsel, and she did not do so. Apparently the court was not advised of the refusal of Mrs. Runsick to permit interrogation by appellant's counsel until after the trial when this occurrence was related in support of appellant's motion for new trial.

When appellant's counsel returned to the courtroom following his unsuccessful attempt to interrogate Mrs. Runsick, the prosecutor made the following statement:

'Your Honor, it has just come to my attention, and I did know it at one time, that my Investigator, of course he went to Wichita, and I think I told [appellant's counsel] that; I know I told everybody else in Kennett, it's been widely known and there was certainly no conspiracy to keep that a secret. My Investigator did take a taped statement from her when he was in Wichita. I can't specifically recall listening to it. He told me what occurred there. A taped statement was made.'

Appellant then renewed his request for a mistrial, which was not granted. There followed a discussion concerning the location of the tape during which appellant's counsel addressed the court as follows: 'If you will not grant the Defendant a mistrial will you exclude the testimony of this witness?' The court replied that it had 'in mind granting a continuance until such time as the Prosecutor provides that tape' to appellant's counsel, and until there was ample opportunity to listen to the tape before he cross-examined Mrs. Runsick. A recess was declared, and following a telephone call to the prosecutor's office, it was developed that the tape was in the briefcase of Mr. Harold W. Jackson, the investigator who had gone to Wichita to interview Mrs. Runsick and who was in the courtroom, and that the briefcase was in the prosecuting attorney's automobile. During this discussion it was also developed that on February 1, which was less than one week before the trial started, appellant's counsel had gone to the office of the prosecuting attorney and made copies of several tapes furnished to him by Mr. Jackson which contained statements of prospective witnesses, but the tape containing the statement of Mrs. Runsick, which had been taken on January 22, was not made available to him.

When the trial court announced it would continue the recess until counsel had the opportunity to listen to the tape, appellant's counsel suggested that if Mrs. Runsick

would remain available for cross–examination he could play the tape later rather than have the jury wait, and that the trial could be resumed at once. Appellant subsequently elected not to cross–examine Mrs. Runsick. The tape was introduced in evidence, and in the statement of Mrs. Runsick there recorded she said among other things that 'the boy come in, there was two, one a lot bigger than the other, and they were just choking her to death.'

Mrs. Rosa Runsick was indorsed as a witness, and there is no doubt that the state intended to call her if she was coherent and capable of testifying. Her ability to testify was determined on January 22, 1979, approximately two weeks before the case was set for trial when a taped statement was obtained from her.

The duty to disclose pursuant to what is now Rule 25.03 'is a continuing one,' *State v. Curtis*, 544 S.W.2d 580, 582 (Mo. banc 1976), and it is not discretionary, *State v. Stapleton*, 539 S.W.2d 655 (Mo.App.1976). *See also* what at the time of trial of this case was Rule 25.45 and is now Rule 25.16, and *State v. Davis*, 556 S.W.2d 45 (Mo. banc 1977). The taped statement was obtained by the prosecutor approximately two weeks before the date of trial, and in view of the written request for disclosure, upon obtaining that taped statement from Mrs. Runsick there immediately arose the duty to make it available to appellant's counsel. The failure to do so is more pronounced by the circumstance that one week before trial appellant's counsel went to the office of the prosecutor and was there provided several taped statements of prospective witnesses, but the taped statement of Mrs. Runsick was not one of them.

Rule 25.45 (now Rule 25.16) grants to the trial court several courses of action when a party fails to comply with a proper discovery rule or order, and what remedial action should be taken is a matter for the exercise of discretion, *State v. Davis, supra*, but the exercise of that discretion must be reasonable under the circumstances, and it cannot meet that standard if it results in fundamental unfairness. *State v. Scott*,

479 S.W.2d 438 (Mo. banc 1972). In this case the trial court ordered a recess to permit appellant's counsel to listen to the taped statements of Mrs. Runsick. The jury had already been sworn and the trial started. An extended recess would not have been practicable because the jury had been sequestered. The trial court refused a mistrial and it refused to instruct the jury that the testimony of Mrs. Runsick had been excluded and was not to be considered.

The basic object of the process of pretrial discovery, insofar as a defendant in a criminal prosecution is concerned, is to permit him a decent opportunity to prepare in advance of trial, and thereby extend to him the fundamental fairness which the adversary system aims to provide. *State v. Scott, supra*; *State v. Johnson*, 524 S.W.2d 97 (Mo. banc 1975). In this case appellant's counsel prepared for trial on the theory that there would be no witness who could place appellant at the scene of the crime except Gary Ward who was also charged with the homicide and who obviously had an interest in placing the primary blame for the crime on someone else. Appellant's strategy was made abundantly clear at the time of the opening statements. Then, in the course of the trial, the only eyewitness to the crime, to the complete surprise of appellant's counsel, testified that 'two boys' entered the house and killed Mrs. Tuggle. Mrs. Runsick was not asked on direct examination to identify either of the 'two boys' or whether appellant was one of them. Appellant was then placed in the position of being required to ask the question on cross–examination, and not knowing her answer because of the failure of the state to comply with the rules of pretrial discovery and the refusal of Mrs. Runsick to submit to interrogation, or to permit the damaging testimony to stand without further explanation. This is precisely the unfair position that the rules pertaining to pretrial discovery were intended to prevent.

We agree that the drastic remedy of a mistrial should not be used simply because a statement of a prospective witness is not produced, *State v. Johnson, supra*, but in

the circumstances of this case the failure to declare a mistrial resulted in fundamental unfairness, and for that reason the judgment cannot be permitted to stand."

Additionally, I agree with Donnelly, J., as to the eroding effect that appellate and Supreme Court opinions are having with respect to the enforcement of discovery and consequentially upon the judicial process in criminal cases. This case, to me, clearly demonstrates a situation where the defendant was placed in an extremely awkward position during the trial as a direct and immediate consequence of the prosecutor's failure to abide the discovery rules of this Court. In my opinion, a mistrial should have been declared and it was an abuse of discretion to fail to do so. I believe that it is inadvisable to excuse the prosecutor's delinquency and its effect upon this trial because the defendant failed to make further demand for mistrial or other relief after the witness refused to speak with the defense counsel. The entire event was brought about as a direct result of the prosecutor's failure or refusal to abide the rules of this Court and the court's failure to either strike the testimony or grant a mistrial. Therefore the trial was, in my opinion, unfair, and if the rules are to mean anything then enforcement must come by way of reversal and remand, particularly where the unfairness of the trial has been as clearly demonstrated as in this case.

I therefore dissent.

DONNELLY, Judge, dissenting.

On October 9, 1973, this Court, as part of its Rules of Criminal Procedure, provided for pretrial discovery in criminal cases. *See* present Rule 25. Rule 25 represents an attempt to provide the process due the people of Missouri (the public, the victims, and the accused) in the administration of criminal justice. Mo.Const., art. I, §§ 2 and 10. *See ABA Standards Relating to Discovery and Procedure Before Trial* (1970).

This appeal is the latest in an alarming number of cases involving noncompliance with the rule that have reached our appellate courts. *See, e. g.,* cases where the state

has failed to comply: *State v. Carter,* 572 S.W.2d 430 (Mo. banc 1978); *State v. Davis,* 556 S.W.2d 45 (Mo. banc 1977); *State v. Barton,* 593 S.W.2d 262 (Mo.App.1980); *State v. Lorenze,* 592 S.W.2d 523 (Mo.App. 1979); *State v. Miller,* 588 S.W.2d 237 (Mo. App.1979); *State v. Gormon,* 584 S.W.2d 420 (Mo.App.1979); *State v. Bebee,* 577 S.W.2d 658 (Mo.App.1979); *State v. Davis,* 572 S.W.2d 243 (Mo.App.1978); *State v. Barker,* 572 S.W.2d 185 (Mo.App.1978); *State v. Flenoid,* 572 S.W.2d 179 (Mo.App. 1978); *State v. Washington,* 570 S.W.2d 838 (Mo.App.1978); *State v. Friend,* 570 S.W.2d 817 (Mo.App.1978); *State v. Couch,* 569 S.W.2d 789 (Mo.App.1978); *State v. Wood,* 562 S.W.2d 699 (Mo.App.1978); *State v. Sykes,* 559 S.W.2d 643 (Mo.App.1977); *State v. Broyles,* 559 S.W.2d 614 (Mo.App.1977); *State v. Helms,* 559 S.W.2d 587 (Mo.App. 1977); *State v. Fields,* 547 S.W.2d 893 (Mo. App.1977); *State v. Wendell,* 547 S.W.2d 807 (Mo.App.1977); *State v. Moten,* 542 S.W.2d 317 (Mo.App.1976); *State v. Stapleton,* 539 S.W.2d 655 (Mo.App.1976); *State v. Dayton,* 535 S.W.2d 469 (Mo.App.1976); *State v. Buckner,* 526 S.W.2d 387 (Mo.App. 1975). *See, e. g.,* cases where the accused has failed to comply: *State v. Inscore,* 592 S.W.2d 809 (Mo. banc 1980); *State v. Stevenson,* 589 S.W.2d 44 (Mo.App.1979); *State v. Umfleet,* 587 S.W.2d 612 (Mo.App.1979); *State v. Thomas,* 579 S.W.2d 145 (Mo.App. 1979); *State v. Ellis,* 567 S.W.2d 454 (Mo. App.1978); *State v. Eddy,* 564 S.W.2d 938 (Mo.App.1978); *State v. Burton,* 544 S.W.2d 60 (Mo.App.1976); *State v. Cox,* 542 S.W.2d 40 (Mo.App.1976); *State v. Favell,* 536 S.W.2d 47 (Mo.App.1976).

Historically, the test followed on appeal has been whether "the failure to produce resulted in fundamental unfairness * *." *State v. Davis,* 556 S.W.2d 45, 48 (Mo. banc 1977). In my view, if this Court is to make its criminal discovery procedure work so as to preserve its integrity and purpose, we must make the failure to comply more costly. We must insist that Rule 25 be followed by the state *and* defendants.

Accordingly, where there is a failure to comply with Rule 25, prejudicial error

should "be presumed unless it is made perfectly clear \* \* \* that no prejudice could have resulted from such [failure]." *Brown v. St. Louis Pub. Serv. Co.*, 421 S.W.2d 255, 259 (Mo. banc 1967).

I recognize that if this position were adopted, trial judges would be much inclined to declare mistrials in cases where there has been a failure to comply with Rule 25. And, I recognize the constraints of the Double Jeopardy Clause of the United States Constitution when mistrials are declared. *See* P. Westen & R. Drubel, *Toward a General Theory of Double Jeopardy*, 1978 Supreme Court Review 81, 85–97; *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824); *Arizona v. Washington*, 434 U.S. 497, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978). *See also State v. Stevenson*, 589 S.W.2d 44, 49 (Mo.App.1979). Adoption of the approach I espouse would involve a degree of brinksmanship. However, there is some reason for optimism since the declaration of a mistrial for non-compliance would be "designed to implement a legitimate state policy, with no suggestion that the implementation of that policy \* \* \* could be manipulated so as to prejudice the defendant." *Illinois v. Somerville*, 410 U.S. 458, 469, 93 S.Ct. 1066, 1073, 35 L.Ed.2d 425 (1973). The Supreme Court has recognized that "a defendant's valued right to have his trial completed by a particular tribunal must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments." *Wade v. Hunter*, 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949). I would hope that if the Court were faced with a choice between a state policy of meaningful discovery in criminal cases and "a defendant's valued right to have his trial completed by a particular tribunal," the latter would yield. *See* Brennan, *Remarks on Discovery*, 33 F.R.D. 56 (1963); *Henry v. Mississippi*, 379 U.S. 443, 447, 448, 85 S.Ct. 564, 567, 13 L.Ed.2d 408 (1965).

I respectfully dissent.

SEILER, Judge, dissenting.

We should be grateful, in my opinion, to our brother Donnelly for bringing to our attention what has been taking place in the area of criminal discovery. I refer to his compilation of the many cases of noncompliance with the discovery rules. These cases portray a disturbing trend which I think should be halted.

Instead of our having a system of discovery which operates smoothly and routinely as a matter of course upon a request made in compliance with the rules (Rule 25.03, for example states that the state shall, upon written request of defendant's counsel, disclose certain material and information) we are developing a system of discovery where the parties, particularly the state, can neglect to provide discovery, and unless defendant can prove he is prejudiced to the point of reversible error by the state's failure to comply, the failure to comply is excused.

This approach defeats discovery. It is as though the rule were to provide that upon a request for discovery being made, the state need not comply unless the defendant can prove prejudice. This puts us back, as a practical matter, to the days when there was no discovery in criminal cases. This is not sound, in my opinion, as a matter of policy and furthermore, it encourages violation of our discovery rules, which are simple and direct. They should be honored by their observance, not by their breach.

The battle over whether there should or should not be discovery in criminal cases in Missouri was fought over a long period of time. Simeone, The New Rules of Criminal Discovery in Missouri, 31 J. of Mo. Bar 16 (1975). The decision to provide for discovery in Missouri was not arrived at hastily. It was done only after prolonged and careful consideration by the court of the views of prosecutors, defense lawyers, trial judges, criminal law scholars, a subcommittee of the Missouri Bar Criminal Law Committee, and the Missouri Bar itself.

Discovery in criminal cases, just as in civil cases, is highly beneficial to the courts, the litigants, and the public. By getting the facts out in the open it encourages the disposition of cases. It brings about settle-

ments in criminal cases just as in civil cases. It produces disposition by guilty pleas in some cases and by dismissals in others, where without discovery, a trial would otherwise be necessary.

But as long as such a gross failure to abide by the discovery rules as took place in this case is not held to be reversible error, we are, in effect, permitting those who violate the rules to rewrite the discovery rules. Soon, just as was predicted in the civil area when we went to pattern instructions, if we permit the litigants to "improve" the discovery rules to their benefit, by not complying and imposing no penalty unless the opposite party can shoulder the heavy burden of showing direct, outright, reversible prejudice (something almost impossible, because no one knows how the trial would have gone had the discoverable information been made available on time as required by the rules), we will reach the point, if we have not already done so, where it can be said about our discovery rules that "after a while the court will not be able to find the original with a divining rod."

Another disturbing aspect of this matter is that in the cases cited where the defendant fails to comply with discovery rules, he has been made to pay the price at the trial level, generally by exclusion of evidence or a witness or declaration of a mistrial. But when it works the other way, and the state is the one violating the rules, the state, in the cited cases, pays no penalty at the trial level and then, on appeal, the failure to comply is excused in almost every case on the ground the defendant has failed to show prejudice. This is not an evenhanded treatment of those who violate the discovery rules.

I would be willing to try Judge Donnelly's suggestion as to how to make the discovery process work in the future, or I would be willing to reverse and remand this case because the trial judge clearly misjudged his discretion in refusing to declare a mistrial and also because of the dampening effect which I believe an affirmance in this case would have on future compliance with our discovery rules. Above all, we

should make it clear that failure to abide by the discovery rules such as occurred in this case will not be permitted.

Accordingly, I respectfully dissent.