**STATE of Missouri, Respondent,**

v.

**Jason JAMISON, Appellant.**

**No. ED 82695.**

Missouri Court of Appeals, Eastern District, Division Two.

May 10, 2005.

---

Lisa M. Stroup, St. Louis, MO, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Dora A. Fichter, Asst. Attorney General, Jefferson City, MO, for respondent.

ROBERT G. DOWD, JR., Judge.

Jason L. Jamison (Defendant) appeals from the judgment upon his conviction by a jury of murder in the second degree, Section 565.021, RSMo 2000,[1] and armed criminal action, Section 571.015, in the death of Jeron Hamilton (Victim). The trial court sentenced Defendant to two terms of thirty years' imprisonment to be served concurrently. On appeal, Defendant argues the trial court erred in allowing the state to use a taped statement that was not provided to defense counsel to impeach a witness and in allowing a witness to testify about an uncharged crime. We affirm.

---

1. Unless otherwise indicated, all further statutory references are to RSMo 2000.

Defendant does not challenge the sufficiency of the evidence. Viewed in the light most favorable to the verdict, the evidence established that on December 1, 2001, Defendant was at the home of his girlfriend, Latasha Smith (Smith). Defendant and Smith sat on steps outside of the front door while Smith's niece and nephews played in the front yard. Defendant told Smith to take the kids in the house. Smith told the kids to go inside while Defendant descended the steps. Defendant approached Victim and John Johnson (Johnson) who were walking down the street. Johnson noticed that Defendant was hiding a sawed-off shotgun in his shirt sleeve. Defendant asked Victim if he participated in a fight that occurred on the previous day in which Defendant was allegedly injured. Victim said that he did not know what Defendant was talking about. After Smith took the kids into the house, she followed Defendant down the street. Smith told Defendant, Johnson, and Victim to stop arguing. Smith turned and began walking away. Defendant said to Victim, "I think your buddy is one of the ones who did it." Both Johnson and Victim replied: "Put that gun up. That gun don't mean nothing." In response, Defendant shot Victim. After hearing the gunshot, Smith ran to her house. Defendant ran past Smith and continued to run past her house. Victim died as a result of a gunshot wound to the head.

Upon hearing that he was a suspect in the case, Defendant turned himself in. At trial, Defendant testified that he did not shoot Victim. Defendant claimed he was not carrying a gun as he approached Johnson and Victim. Defendant claimed he asked them about why they "jumped him" on the previous day and in response, Victim replied, "I had my peoples knock you." Defendant testified that as he began to walk away he heard a gunshot which caused him to run for his own safety. At the close of evidence, the jury returned a verdict of guilty of the lesser-included offense of murder in the second degree and armed criminal action. This appeal follows.

▮ In his first point, Defendant argues the trial court abused its discretion in allowing the state to impeach Smith with information from her taped statement to police because the State failed to provide Defendant a copy of the tape during discovery in accordance with Rule 25.03. Defendant argues this violation restricted his ability to prepare an effective defense against Smith's previous statements and ultimately resulted in fundamental unfairness. We disagree.

Before trial, defense counsel filed a request for discovery asking for the names of all persons the State intended to call as witnesses at any hearing or trial, including their written or recorded statements. The state provided defense counsel with a list of witnesses, which included Smith, but did not provide any written or recorded statement made by Smith. After the shooting, police questioned Smith about the incident and recorded her answers. A police report disclosed to Defendant mentioned this recording. At Defendant's first trial, which resulted in a hung jury, Smith testified, but the tape was never used. At the retrial, the state again called Smith as one of its witnesses. During Smith's testimony the prosecutor realized that her testimony had changed since the first trial. At that point, the prosecutor sought to impeach her as a hostile witness with prior inconsistent taped statements she made to the police. The defense attorney objected as follows:

MR. BASHIR: [defense counsel] This tape appeared right here, one minute from now. While they set up the rules of discovery, never gave defense a copy.

MS. BRYANT [prosecutor]: That's—

COURT: Wait a second; one second.

MR. BASHIR: Has never given me a copy; she never used it in the last trial. And whatever she wants to, somehow, she wants the tape—but she has given all the answers, whatever she asked. I haven't heard any contradictions so far. So how can she play something which I don't know what does it contain?

COURT: What about this tape? Has he ever received the tape?

MS. BRYANT: I don't know. He never—when I was talking to him at lunch, I mentioned the tape.

MR. BASHIR: Today.

MS. BRYANT: You know the tape is in the police report. You got discovery. You never sent me any blank tapes. You want to take a recess, you can listen to it.

MR. BASHIR: The tape was never mentioned in the last trial—

* * * *

THE COURT: If he didn't have the tape, you can't use the tape. Now, if you want to impeach your witness, something she said recently, and not through the use of the tape, if you didn't give that to [defense counsel].

* * * *

MS. BRYANT: Wait a minute. Just because I shouldn't (sic) be penalized because he didn't take it upon himself to come and get it. He was told about it.

THE COURT: If you've got some evidence that he was told to come and get the tape, then—

MS. BRYANT: Yes; the police report. It is in there.

(State retrieves police report; presents it at side bar.)

MR. BASHIR: Well, it's in there, in the police report, but she never used it in the last trial. She never gave me a copy of it. How do I know what the tape contains, and the witness is alive and present, and that's the point. How does she even get to play the tape? What—for what purpose?

The court asked Defendant for his general discovery request. Both parties continued to disagree about the discovery practice of providing recorded statements. The prosecuting attorney argued that defendants were responsible for sending a blank tape on which the recording could be copied. The defense attorney argued that this requirement only applied to video tapes, but not audio tapes. The court responded:

THE COURT: All right; here's what I'll do. I will allow you to impeach her, based on your information of what's in the tape. I'm not going to allow the tape to be used. Now, later on, if I discover the practice is somewhat different, then we'll deal with that. But I'll declare her a hostile witness. You may impeach her and ask her question about, did she say such-and-such on the tape. If she denies it right now, it's going to rest at that. You won't be able to play the tape until I've found out just what the practice is.

The state proceeded to impeach Smith with her taped statements. Smith testified that she did not recall telling the police on her taped statement that Defendant yelled at her, that no one was outside during the incident, that she and Defendant took five to ten steps away from Victim while arguing in the street, or that Defendant shot Victim. Smith admitted to previously saying that Johnson and Victim were standing down the street "minding their own business," and that Defendant told her, "That's the nigger who jumped me," as he walked down the steps. Smith also recalled saying that she never thought

that "Defendant would do something like this." Defense counsel cross-examined Smith about her answers. Smith testified that on the day of the incident, a lot of people were outside. She further testified that after she intervened, Defendant stepped back and started walking away and then she heard a shot. Smith reiterated that she did not see Defendant shoot Victim.

■■■■ If requested in writing by defense counsel, the state must disclose the written or recorded statements of the witnesses it intends to call at trial and must also disclose the substance of any oral statement made by the defendant along with the names of those persons who witnessed defendant making the statement. Rule 25.03; *State v. Grant,* 784 S.W.2d 831, 835 (Mo.App. E.D.1990). The purpose of this discovery rule is to grant the defendant a decent opportunity to prepare his case in advance of trial and avoid surprise. *Grant,* 784 S.W.2d at 835. Compliance with this rule is mandatory, not discretionary. *Id.* Appropriate sanctions for failure to make timely disclosure are left to the sound discretion of the trial court. *State v. Myers,* 997 S.W.2d 26, 33 (Mo.App. S.D.1999). Appellate courts will intervene only where a defendant shows that the failure to make a timely disclosure resulted in fundamental unfairness. *Id.* Fundamental unfairness turns on whether there was a reasonable likelihood that an earlier disclosure of the requested evidence would have affected the result of the trial. *Grant,* 784 S.W.2d at 835. Here, the state violated Rule 25.03. However, this failure to disclose did not result in fundamental unfairness because there was overwhelming evidence of Defendant's guilt. At trial, Johnson testified that Defendant approached him and Victim while carrying "a big sawed-off shotgun" in his sleeve. Johnson testified that after the verbal con-

frontation between Johnson, Victim and Defendant, Defendant shot Victim and ran away. Johnson later picked Defendant out of a police line-up. There was no showing at trial that Johnson was a biased witness. Further, Smith's trial testimony, unaided by the tape, indicated that after Defendant told her to take the kids inside, she believed Defendant was angry and was going to fight somebody. Smith also testified that she got in between Defendant and Victim and yelled at them to stop arguing. Smith testified that after she heard the gun shot, Defendant ran past her away from the scene of the crime. Finally, Defendant admitted that a gang beat him up and took twenty dollars from him. Defendant admitted that he confronted two "gang members" Johnson and Victim and used "harsh words" when asking why they beat him up on the previous day. Defendant admitted to telling his girlfriend immediately before approaching Johnson and Victim that he was going to fight somebody. Defendant also admitted that he was present at the scene of the crime. This testimony, taken together, presents overwhelming evidence of Defendant's guilt.

Defendant relies on *State v. Harrington,* 534 S.W.2d 44 (Mo. banc 1976), and *State v. Mease,* 842 S.W.2d 98 (Mo. banc 1992) to argue that the state's discovery violation caused fundamental unfairness. In *Harrington,* the state failed to disclose the defendant's oral statements made to the Federal Bureau of Investigation until the day before trial. 534 S.W.2d at 46. The Court held that the denial of pretrial inspection of the defendant's own statement describing the shooting as accidental constituted fundamental unfairness because the statement contradicted his trial theory of self-defense. *Id.* at 46–47. In *Mease,* a witness agreed to testify after granted immunity. 842 S.W.2d at 108. The prosecutor informed defense counsel

of this agreement, but the defense counsel did not attempt to depose the witness. *Id.* The court held that the defendant was not denied meaningful discovery because he was aware of the witness's prior statement and did not take steps to depose the witness. *Id.*

Here, the State argues that Defendant cannot show that he was surprised by the existence of the recorded statements to the police because the tape was mentioned in the police report. The reference to the tape in the police report does not excuse the prosecutor's failure to disclose the tapes. However, while the prosecutor clearly violated discovery rules by failing to disclose the tape, Defendant failed to prove that the late disclosure resulted in fundamental unfairness. Defendant could have requested to listen to the tape prior to Smith's impeachment. Further, Defendant failed to prove Smith's impeachment by her previously taped statement contradicted his trial theory that someone else shot the victim. During the impeachment, Smith denied saying that Defendant shot the victim. Smith admitted to saying that she was surprised that "Defendant would do something like this," but on cross-examination defense counsel asked Smith to explain her statement. Smith replied that, "[she] was under the impression that he did it because of the detectives telling me." Smith testified that during her taped statement she told the police that Defendant said, "That's the nigger who jumped me," as he walked down the steps and that she told her mom she thought that Defendant was going to fight someone. This testimony did not create fundamental unfairness for Defendant because these statements were consistent with Smith's prior trial testimony that she thought Defendant was going to start a fight. Further, on cross-examination Smith reiterated that she heard the gunshot, but did not see Defendant shoot the victim. This was corroborated by Johnson, who testified Smith had her back to them and was on her way up the steps when the shot was fired. Thus, Defendant failed to prove that allowing the state to impeach Smith with her taped statements affected the result of the trial, especially considering the totality of the evidence, including Johnson's eyewitness testimony, which provided overwhelming evidence of Defendant's guilt.

Defendant also relies on *State v. Smothers,* 605 S.W.2d 128 (Mo. banc 1980), and *State v. Bradley,* 882 S.W.2d 302 (Mo.App. S.D.1994) to argue he is entitled to relief. In *Smothers,* the state produced a tape recording of a witness at trial that was not previously disclosed to the defense counsel. 605 S.W.2d at 130–31. The Court held that the prosecutor's failure to disclose the tape after the defendant's written request violated discovery rules. *Id.* at 131. However, the court also held that the late disclosure did not result in fundamental unfairness or prejudice to the substantial rights of the defendant because the trial court allowed the defendant to listen to the tape prior to cross-examination. *Id.* at 132. Further, the defendant failed to prove that allowing the witness to testify affected the result of the trial. *Id.* at 133. In *Bradley,* the state disclosed five videotaped recordings in response to the defendant's request for discovery as the only tapes the state intended to use at trial. 882 S.W.2d at 303–04. At trial, the state informed the defense counsel of the existence of a sixth tape. *Id.* at 304. This tape was admitted into evidence over defense counsel's objections. *Id.* at 305. The *Bradley* court held that the trial court abused its discretion in admitting this tape into evidence because the defendant was entitled to rely on the state's representation that only the five tapes produced would be used at trial. *Id.* at 308.

Here, like in *Smothers* and *Bradley*, the state failed to disclose a taped recording before trial. When a party has failed to comply with an applicable discovery rule, the court may order disclosure of the information, grant a continuance, exclude such evidence, or enter such other orders it deems just under the circumstances. Rule 25.16; *State v. Wallace*, 43 S.W.3d 398, 402 (Mo.App. E.D.2001). Here, unlike *Bradley*, the trial court restricted the use of the tape for impeachment purposes and did not admit the tape into evidence. In response to this ruling, Defendant did not ask for a recess to listen to tape or for a continuance at trial. Moreover, as previously discussed, the trial court's decision in allowing the state to impeach Smith with her prior taped statements did not cause fundamental unfairness. Thus, the trial court appropriately acted within its discretion in excluding the tape from evidence.[2] Point one is denied.

■■■■ In his second point, Defendant argues the trial court plainly erred in allowing Johnson to testify that Defendant had sold him marijuana. Defendant argues that this testimony constituted an improper reference to another crime for which he was not charged, distributing a controlled substance, and thus, was unfairly prejudicial. We disagree.

At trial, the state called Johnson as a witness. Johnson testified about the events that transpired on the street, and about his role in identifying Defendant in a police line-up. Part of Johnson's examination is as follows:

> MS. BRYANT [prosecutor]:.... Did you know the person by the name of Jason Jamison [Defendant]?
>
> JOHNSON: No.

MS. BRYANT: Had you had any interaction with him at all, before?

JOHNSON: Yes.

MS. BRYANT: And what was that?

JOHNSON: I bought some weed from him at one time.

MS. BRYANT: So you had seen him many times, or how many times?

JOHNSON: I would see him here and there.

MS. BRYANT: Here and there? Over the course of what, a year, weeks, or what?

JOHNSON: About two—about two something—about two or three months.

MS. BRYANT: Two or three months?

JOHNSON: Uh-huh.

MS. BRYANT: Now, do you see a person in the courtroom today that you saw sitting, when you were on the street, on Caroline [the street]?

JOHNSON: Yes I do.

MR. BASHIR: [defense counsel] I renew my objection. I renew my objection based on my pre-trial motion [to suppress Johnson's identification of Defendant].

THE COURT: All right; overruled.

Johnson continued and identified Defendant. Later, Defendant testified on his own behalf and denied selling marijuana. On cross-examination, the state wanted to introduce evidence that Defendant had previously been arrested for drug possession to impeach Defendant's testimony. The court sustained defense counsel's objection that the prosecutor could not inquire about Defendant's past drug offenses.

---

**2.** While we have found this discovery violation is not reversible error based on the particular facts of this case, we do not condone the behavior of the prosecutor in failing to disclose the tape during discovery.

Defendant argues that Johnson's testimony was neither logically or legally relevant to the second-degree murder or armed criminal action offenses for which he was on trial and that the trial court erred in allowing such testimony. Defendant's counsel did not object to Johnson's testimony at trial, so the issue was not preserved for appellate review. *See State v. Campbell,* 147 S.W.3d 195, 205 (Mo.App. S.D.2004). However, Defendant requests this court to review the alleged evidentiary error for plain error under Rule 30.20. In seeking plain error review, Defendant bears the burden of demonstrating plain error resulting in manifest injustice. *State v. Kalagian,* 833 S.W.2d 431, 434 (Mo.App.E.D.1992). Plain error review should be used sparingly and does not justify review of every alleged trial error that has not been properly preserved for appellate review. *State v. Bolds,* 11 S.W.3d 633, 638 (Mo.App. E.D.1999). Plain error review is limited to those cases where the alleged error so substantially affects the rights of the accused that a manifest injustice or miscarriage of justice would inexorably result if left uncorrected. *State v. Hadley,* 815 S.W.2d 422, 423 (Mo. banc 1991). A trial court has a broad discretion to admit and exclude evidence at trial, and error will be found only if this discretion was clearly abused. *Bolds,* 11 S.W.3d at 638.

Generally, evidence which tends to prove crimes other than the one charged is inadmissible. *State v. Davis,* 806 S.W.2d 441, 442 (Mo.App. E.D.1991). However, such evidence is admissible if it falls within a well-established exception to the general rule. *State v. Clover,* 924 S.W.2d 853, 855 (Mo. banc 1996). Evidence of an uncharged crime is admissible if it is logically and legally relevant. *Id.* Evidence is logically relevant where it has some legitimate tendency to establish directly the accused's guilt of the charges for which he is on trial. *Id.* Evidence demonstrating the identity of the person charged with the commission of the crime is logically relevant. *Id.* Evidence is legally relevant where its probative value outweighs its prejudicial effect. *Id.*

Here, Johnson's testimony is logically relevant because it demonstrated Johnson's ability to identity the person charged with the crime. Defendant argues even if Mr. Johnson's testimony is relevant as to identity, the court's failure to intervene sua sponte and limit Johnson's testimony resulted in unfair prejudice.

Defendant relies on *State v. Bernard,* 849 S.W.2d 10 (Mo. banc 1993), to argue Johnson's testimony was not legally relevant and thus, was inadmissible. In *Bernard,* the state sought to admit testimony from four witnesses regarding prior sexual abuse committed by the defendant for which he was never charged. *Id.* at 18–19. The Court held the testimony of the four young men who said the defendant had them run naked in front of a car driven by the defendant was admissible in evidence under the common scheme or plan exception to the uncharged crime rule for the purpose of proving the identity of the wrongdoer. *Id.* at 19–20. For corroboration evidence to be of sufficiently increased probative value so as to outweigh its prejudicial effect, the charged and uncharged crimes must be so nearly identical and their methodology so unusual and distinctive that they resemble a signature of the defendant's involvement in both crimes. *Id.* at 17.

Here, unlike *Bernard,* Johnson's testimony demonstrated his ability to identify Defendant, and was not used to prove the identity of the wrongdoer by evidence of a common scheme or plan. Admission of Johnson's isolated remark that he "bought some weed from [Defendant] at one time"

did not unfairly prejudice Defendant or result in manifest injustice, especially considering the overwhelming evidence of Defendant's guilt. Point two is denied.

The judgment of the trial court is affirmed.

PATRICIA L. COHEN, P.J. and KATHIANNE KNAUP CRANE, J., concur.